**RUST ENGINEERING COMPANY**

v.

**LAWRENCE PUMPS, INC.**

**Civ. A. No. 72–1835–C.**

United States District Court,
D. Massachusetts.

Sept. 18, 1975.

Laurence S. Fordham, William J. Cheeseman, Foley, Hoag & Eliot, Boston, Mass., for plaintiff.

Franklin N. Cunningham, Warner & Stackpole, Boston, Mass., for defendant.

## OPINION

CAFFREY, Chief Judge.

This is a civil action for breach of contract and for breach of implied and express warranties which was tried to the Court. Jurisdiction is based on 28 U.S.C.A. § 1332. Plaintiff Rust Engineering Company (Rust) is a corporation organized under the laws of the State of Delaware and defendant Lawrence Pumps, Inc. (Lawrence) is a corporation organized under the laws of the Commonwealth of Massachusetts. Defendant is a manufacturer of pumps for industrial and commercial uses and applications. Plaintiff, prior to entering into the contract with defendant, had entered into a contract with American Smelting and Refining Company (ASARCO) under the terms of which plaintiff was to erect a smelter acid plant in Arizona. The acid plant was intended to capture waste sulfur dioxide, a gas produced during the smelting process, and to convert it into sulfuric

acid, a marketable product. The design and construction of the new plant was required to comply with state and federal anti-pollution regulations.

The subject matter of the instant controversy is a group of circulating acid pumps which defendant agreed to manufacture, deliver and install at the Arizona plant. The particular pumps involved here are vertical submerged pumps, i. e., pumps with the pumping elements submerged in the liquid acid to be pumped. In these pumps the pumping element was located at the bottom of a vertical shaft submerged in the liquid. The motor was located on the top of a column which contained the shaft and on a supporting plate which covered the opening in the vessel into which the liquid was to be pumped.

Plaintiff does not manufacture pumps itself, but follows the practice of obtaining them from outside manufacturers. Initially, plaintiff considered ordering the pumps for this project from the Lewis Pump Company, but ultimately entered into negotiations with defendant. The first meeting between representatives of plaintiff and defendant tool place at plaintiff's Pittsburgh offices in June 1969. In the course of this meeting the discussions covered the nature of the facility which would be used to capture the waste sulfur dioxide which was being emitted from sulfur stacks, the place and function of the pumps in this system, the type and number of pumps which would be needed and conditions and types of acid that would be handled.

Specifications for the pumps to be manufactured by defendant were prepared by plaintiff and sent to defendant and on or about July 7, 1969 defendant mailed plaintiff a written proposal for the manufacture and sale to plaintiff of nine sulfuric acid pumps which would conform to the specifications for installation in the smelter acid plant to be constructed by plaintiff for ASARCO. A purchase order was issued by plaintiff to defendant on August 6, 1969 for nine pumps. The purchase order described five of the pumps as being 8″ circular pumps, two were described as being 2″ production pumps and two were described as being 4″ production pumps. The purchase order further provided that the pumps would be in accordance with specification 0447–8 which specification was attached to the purchase order.

The purchase order incorporated the specifications previously supplied to defendant by Rust and defendant's proposal letter. The fluid to be pumped by the drying tower pumps was described as 93% sulfuric acid and the fluid to be pumped by the absorption tower pumps was specified as "98.4% sulfuric acid." There was no mention in the specifications of the presence of any quantity of solid impurities in the acid. The purchase order adopted a suggestion by defendant contained in Option I providing for an alloy #20 increaser-elbow and an alloy #20 ceramic faced shaft sleeve, as well as defendant's suggestion in Option II for an alloy #20 casing and suction discs. The specifications also contained a "Process Guarantee" which was as follows:

"The Vendor shall guarantee that the equipment, as designed and furnished, is capable of performing the specified duties in a manner satisfactory to the Purchaser. The Vendor shall also guarantee all parts against defective materials and workmanship for a period of one year from the date of installation, to the extent that he shall replace f.o.b. job site, without additional cost to the Owners, any equipment found to be defective or otherwise unsuited to the purpose intended."

The specifications also adopted the following from defendant's proposal letter:

*"PUMP LIFE*

In the given service of acid concentration and temperature the Alloy #20 material, Illium G material and Illium 98 material will have less than

0.020″ per year corrosion rate. Within this span the corrosion relation among the three alloys will be Illium 98 having the least rate, Illium G being next and Alloy #20 undergoing the greatest attack.

With the basic construction the discharge elbow and shaft sleeves will be the limiting elements. Using Option I in addition to the basic construction, it will be possible to extend the life of the units by 6 to 9 months.

Having incorporated Option No. I the next limiting element will then be the pump casing and suction disc, therefore, Option II, if used, will increase the life of the pumps by 12 to 15 months over the basic life.

At this time we do not recommend to go beyond Option No. II (which would mean to make the whole pump out of Alloy #20 as a minimum) as the sleeve bearing life will now be the limiting factor between pump pulling. Based on an arrangement which will provide for a pump alternating arrangement we estimate that the pumps will not need to be pulled for maintenance in less than two years."

Defendant manufactured the nine pumps and delivered them to plaintiff at Hayden, Arizona in the summer of 1970, after which the purchase price was paid. The circular pumps were placed in operation during the first week of May 1971 and shortly thereafter the 8″ pumps developed lower sleeve bearing failures.

A service engineer of defendant arrived at the plant on May 13, 1971 at which time the pumps which failed were pulled out of the system and disassembled. It was discovered that lower shaft sleeves and the sleeve bearings and sleeve bearing bushings were almost totally worn away at points where increased clearances had resulted in wearing down the pump impellers and sleeve rings. Some of the shafts were so worn under the bearing sleeves as to indicate that the bearings had seized and the sleeves had rotated on the shafts.

It was also discovered in the course of disassembling the pumps that substantial quantities of a gritty substance were contained therein. The gritty substance was described by a project manager employed by plaintiff as follows: "It was a kind of reddish, grayish, blackish, multi-colored sort of sandy material." The witness testified that he observed it at the top of the bottom bearing bushings and casings and in the impeller. It was later determined to be silica and alumina.

I find that the cause of the destruction of the bearings was the abrasive effect of the silica and alumina suspended in the acid which was being pumped and circulated.

The pumps were put back into service and continued to operate with some sleeve bearing failures in the 8″ pumps until June 1971, when a strike caused the shutdown of the plant. The strike was settled in November 1971 and when operations resumed additional failures occurred in the 8″ pumps during November and December 1971 because of sleeve bearing wear.

I find that the parties intended that the acid in which these pumps were designed to operate would serve as a lubricant between two smooth cylindrical surfaces. Those surfaces were to be kept apart by a wedge-shaped film of lubricant which was to have three functions: that of being slippery and reducing friction; that of being strong enough to carry the load and keep the moving parts separated; and that of having an adequate flow to carry off the heat.

I further find that bearing failure can also be caused by the failure of the acid to serve as a lubricating film between the two cylindrical surfaces. I also find that in this case the reason that the acid failed to function properly as a lubricant was the presence of an excessive quantity of abrasives in the acid which abrasives scored the bearings.

An additional cause of bearing failures is an insufficient supply of lubri-

cant which results in the imposition of an excessive side load on the bearings. This also contributed to the pump failures.

I further find that once the process of bearing failure has started, it will, if the pump is allowed to continue to run, become progressively worse until total destruction has occurred.

■ The crucial question which lies at the base of this controversy requires a decision as to whether the legal relationship between these parties was one in which plaintiff went into the market place looking for a manufacturer who would manufacture and deliver a group of pumps which would meet plaintiff's specification No. 0447–8, dated originally January 29, 1969 and subsequently revised on February 24 and June 25, 1969, or whether, on the other hand, plaintiff was a would be buyer of pumps who went into the market place looking for a company highly experienced in the construction, sale and installation of a certain type of pumps and on whose expertise and past experience plaintiff elected to rely. Plaintiff argues that the latter alternative describes the situation. Defendant contends that the former alternative accurately states this case.

On the basis of the testimony of the witnesses who attended and testified as to a meeting held in Pittsburgh, Pennsylvania at plaintiff's offices there in June 1969, I find that representatives of plaintiff informed representatives of defendant of the general nature of the smelter operation under construction and as to the type of pumps that would be necessary for that project in Hayden, Arizona. I also find, as was admitted by plaintiff's former vice-president and chief engineer George I. Seybold, called as a witness for plaintiff, that representatives of defendant specifically advised representatives of plaintiff at that meeting that defendant had never previously designed a pump intended for use in a continuous circulating system such as this for use in the manufacture of sulfuric acid.

I further find that an early draft of specifications prepared by plaintiff's engineering staff was presented to defendant and discussed at that meeting. At that meeting, I find, that it was made clear by defendant to plaintiff that despite defendant's considerable experience in the manufacture and sales of pumps, that defendant had no previous experience with the type of system designed by plaintiff for the Hayden facility.

I find that defendant did inform plaintiff truthfully as to what types of pumps defendant had manufactured for other uses on other job sites. I find that the specifications supplied by plaintiff were so definitive and precise as to leave Lawrence no room for the exercise of its discretion or differing engineering opinion or expertise as to the appropriate type of material and method to be used in the construction of these pumps (if Lawrence had a differing opinion).

I further find that had Lawrence deviated from the specifications it would have exposed itself to liability for breach of contract should plaintiff have any dissatisfaction with the performance of the pumps. I rule that this obligation to follow specifications in order to comply with the contract eliminated any freedom to apply its own expertise or independent judgment that might have otherwise been available to defendant.

I find that Lawrence did not hold itself out, as contended by plaintiff, as experts in the manufacture of this type of pump and that they knew that this was a new and novel type of facility. I also find that representatives of Rust did not make a fair disclosure to representatives of Lawrence as to the extent of abrasive solids in the acid to be pumped.

The record of this case makes it clear that Lawrence had never designed a sulfuric acid plant before, and equally clear that this fact was brought home to representatives of plaintiff. Equally important, I find, that the contract documents, particularly specifications, were substantially under the control of plaintiff to such an extent that plaintiff

could not, in view of the specifications, reasonably rely on any expertise of Lawrence to supply equipment for this new and novel type of system. I find that plaintiff, in fact, neither relied on the experience of defendant, nor gave defendant a free hand to decide what type of pumps and what type of specifications therefor should be used in manufacturing the equipment which would adequately fill plaintiff's needs at the Hayden project then under construction.

■ Consequently, I rule that there can be no recovery for breach of the implied warranties both due to the fact that Lawrence was not free to exercise its own independent judgment but was bound to follow the specifications and also due to the fact that I find plaintiff did not rely on Lawrence's alleged expertise.

■ To the extent that plaintiff alleges breach of express warranty incorporated in the contract, I find that pump failures herein were not the result of mal-design by the defendant, but were caused by an excessive amount of particles of solid substances in the acid.

I further find that, in any event, the contract limited recovery for breach of express warranty to an obligation on the part of the defendant to the replacement of parts found to be of defective material and workmanship. I find that plaintiff has failed to sustain its burden of proving the existence of defective material or workmanship in the pumps delivered and also that plaintiff has rejected this option even assuming there was defective material or workmanship.

In so finding I rely heavily on the testimony of the witness Arndt called by defendant whom I find to be truthful, informed and possessed of opinions which I accept. I reject as not credible the testimony of the witness Sweat, an employee of ASARCO, and of the witness Lawson, an employee and project manager for plaintiff.

■ On the record of this case, I find and rule that there exists a separate and independent reason on the basis of which plaintiff may not prevail herein, namely, that subsequent to the delivery of the pumps to Arizona and the arising of problems with respect to the performance of the pumps, the parties entered into an accord and satisfaction of this controversy. It is settled law that a claim of accord and satisfaction is an affirmative defense, the burden of proving which rests on defendant. It is likewise established law that the burden on the defendant is to prove three elements (1) that there has arisen between the parties a bona fide dispute as to the existence or extent of liability; (2) that subsequent to the arising of that dispute the parties entered into an agreement under the terms of which the dispute is compromised by the payment by one party of a sum in excess of that which he admits he owes and the receipt by the other party of a sum less in amount than he claims is due him, all for the purpose of settling the dispute; and (3) a performance by the parties of that agreement. *Autographic Register Co. v. Philip Hano Co.*, 198 F.2d 208, 212–13 (1 Cir. 1952).

I find, on the credible evidence in this case, that there was a dispute between the parties as to the operative facts which were the physical cause of the pump failures and there was a dispute as to which party bore the legal responsibility for the failures. I find that negotiations were entered into by duly authorized representatives of both sides looking to resolve the dispute, and I find that after negotiations an agreement of settlement was entered into in which each party received something less than it claimed or, alternatively, paid more than it admitted owing. I find that the parties intended the negotiations to be, as plaintiff employee Lawson characterized them, in Exhibit M, a "final settlement" of the differences, and I find that an agreement was entered into between Mr. Mill, President of defendant, and Mr. Lawson, plaintiff's project manager at the Hayden site, that the parties

would compromise their differences upon the assumption by Rust of its own labor costs, the cancellation by defendant of its invoices for the services and expenses of LeBoeuf and Arndt, and by dividing the total of the invoices for shaft repairs and the replacement of ceramic-faced bearings. I further find that this oral agreement was confirmed in writing in a letter from Lawson to Mill (which is in evidence as Exhibit N) and that to execute the agreement Mr. Lawson directed the execution of a change order (which is in evidence as Exhibit O) as a result of which defendant issued an invoice in the amount of the change order. That invoice was thereafter paid by plaintiff. I find that Mr. Lawson was a duly authorized agent of plaintiff in entering into this accord and satisfaction and was acting within the scope of his duties in so doing.

It should be noted that, if relevant, I find that a claim in the amount of $12,893.49 appended to plaintiff's complaint as part of Attachment E, and a claim in the amount of $13,804.60, also appended to the complaint as part of Attachment E, were both items specifically included among those claims disposed of by the accord and satisfaction.

I rule that it is immaterial as to whether or not an accord and satisfaction took place that, after retaining counsel, plaintiff elected to sue for a larger sum than that discussed in the course of the negotiations leading to the accord and satisfaction.

■ There remains for disposition defendant's counterclaim by which defendant seeks to recover $7794.26 for pump parts either shipped by defendant to plaintiff under plaintiff's Purchase Order No. E 0447–349 or parts manufactured by defendant but not shipped to plaintiff by reason of plaintiff's Purchase Order No. E 0447–356. I rule that defendant has sustained its burden of proving its allegations in support of this counterclaim. In fact, plaintiff has admitted herein, in its reply to the counterclaim, the issuance by it of the purchase order and its receipt of all parts listed by defendant on invoices annexed to the counterclaim. I find that those parts which were not shipped fall into the category of goods "specifically manufactured for the buyer and not suitable for sale to others in the ordinary course of business," within the meaning of the Uniform Commercial Code, M.G.L. c. 106, § 2–201(3)(c). Accordingly, defendant is entitled to judgment in its favor on the counterclaim.

In conclusion, it should be noted that the resolution of this controversy would have been a substantially less onerous task had the parties not elected to rely almost exclusively on their own employees as both fact and expert witnesses. The only witness called who was not a present or retired employee of one of the parties was Mr. Sweat, an employee of ASARCO. The Court in evaluating the credibility of all witnesses herein has in mind that no one who testified was unaware of where his bread is buttered. Had credible independent expert testimony been proferred (which it was not) the Court might have been greatly assisted in the fact finding process. This assistance would have been peculiarly appropriate herein because I find that this entire project, triggered as it was by new and stringent ecological legislation, constituted a new adventure into somewhat uncharted areas for ASARCO, Rust, Lawrence and all other contractors and subcontractors involved in the Hayden, Arizona project. While not articulated fully, it is a permissible inference, from the testimony of plaintiff's own witness Sweat, that many aspects of this project went wrong and many failures occurred, and that in lay language the construction and shakedown of this facility was virtually an unending series of headaches.

Against this background, the evidence suggests to the Court that plaintiff to some extent is trying to depict itself as the tiny World Wide Wickets going to the giant General Motors (Lawrence) and throwing itself on the expertise of

Lawrence. However, I find that is not the true picture and that Lawrence was merely on relatively small corporation called on to supply one precisely specified component, albeit an important one, among a great many components necessary for the project. Finally, I find that defendant, as a mere component supplier, did not, in plaintiff's scheme of things, rise to the dignity of an important expert whose advice and expertise plaintiff elected to rely on.

Judgment accordingly.