## Commonwealth *vs.* Johnson Insulation & others.[1]

Suffolk. May 6, 1997. - July 30, 1997.

Present: Wilkins, C.J., Abrams, Lynch, O'Connor, Greaney, & Marshall, JJ.

*Asbestos. Uniform Commercial Code,* Warranty. *Sale,* Warranty. *Warranty. Contract,* Warranty. *Actionable Tort. Consumer Protection Act,* Availability of remedy, Attorney's fees, Damages. *Limitations, Statute of. Interest. Damages,* Repairs, Remittitur. *Practice, Civil,* New trial.

In an action brought by the Commonwealth, against a company that had under contract supplied and installed asbestos-containing products in a number of State-owned buildings, seeking damages for the costs of removing those materials under a theory of breach of an implied warranty of merchantability, the specifications supplied by the Commonwealth were not so detailed, precise, and complete as to exclude that warranty under G. L. c. 106, § 2-316 (3) (*c*). [654-660]

Evidence at the trial of an action brought against suppliers and installers of asbestos-containing products for breach of the implied warranty of merchantability of those products supported the jury's conclusion that the absence of adequate warnings as to the hazards of asbestos rendered those. products unreasonably dangerous and unfit for their ordinary purposes, in breach of that warranty, and the judge incorrectly granted the defendants' motion for judgment notwithstanding the verdict. [660-662]

The extended limitations period created by St. 1986, c. 336, to allow public entities to file claims to recover the actual costs of asbestos removal, replacement, or other remediation, did not apply to claims under G. L. c. 93A for multiple damages and attorney's fees, where such damages and fees are essentially punitive and are not expenditures that the Legislature intended to be compensated. [662-664]

In an action seeking damages for the cost of asbestos abatement, prejudgment interest was properly calculated on the entire amount of damages for the period from the commencement of the action to the entry of judgment, where the damage to property was suffered when the asbestos-containing product was installed and the determination of future abatement costs were only a measure of that damage. [664-667]

In a civil action in which the trial judge denied as moot the defendants' mo-

---

[1]The action was initially brought against some fifty-five entities, one of which was Johnson Insulation. The Commonwealth later amended the complaint to add five additional entities associated with Johnson Insulation: Johnson Insulation Contracting Co., Inc.; Johnson Asbestos Company; Johnson Asbestos Corporation; Clifton Associates, Inc.; and Clifton R. Johnson Corporation.

tion for remittitur, or in the alternative, a new trial on damages, after he allowed the defendants' motion for judgment notwithstanding the verdict, where the verdict was reinstated on appeal, the defendants were to be given the opportunity to renew their motion. [667-669]

CIVIL ACTION commenced in the Superior Court Department on June 28, 1990.

The case was tried before *Hiller B. Zobel*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Edward T. Dangel, III*, Special Assistant Attorney General (*Alexander T. Bok*, Special Assistant Attorney General, & *Susan Granoff* with him) for the Commonwealth.

*Alice Olsen Mann* (*Gary W. Harvey & Linda J. Molumphy* with her) for the defendants.

GREANEY, J. Asbestos was widely used as an insulator and fire retardant until the 1970's, when it became evident that the material posed health hazards (including lung diseases and cancer) even at low levels of exposure. As a result, the Commonwealth undertook a program to identify and remove asbestos-containing materials that had been installed in its buildings over several decades. To recoup the costs of these remediation activities, the Commonwealth brought an action against numerous companies that had manufactured, supplied, and installed the asbestos-containing products, seeking damages for the costs of removing those materials on the theory that the companies had breached an implied warranty of merchantability. The Commonwealth also sought multiple damages and attorney's fees for violations of the consumer protection statute, G. L. c. 93A.[2] The trial judge ordered the action to be split into three phases, according to the type of asbestos product installed; the case before us involved thermal insulation products, such as those applied to pipes and boilers. All defendants in this phase settled before trial, with two exceptions: Owens-Corning Fiberglas Corporation (Owens) and Johnson Insulation (Johnson).[3] At trial, the jury found that the defendants had furnished products that were unfit for their intended use, and assessed damages for twenty-

[2]The Commonwealth's complaint included additional claims, under other theories, which were not ultimately pressed in this action.

[3]Johnson Insulation encompassed six related entities which were treated at trial as a single defendant. See note 1, *supra*.

one of the twenty-two buildings at issue.[4] After judgment was entered against both defendants for damages and interest, Johnson moved, pursuant to Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974), for judgment notwithstanding the verdict (judgment n.o.v.) or, in the alternative, pursuant to Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), for remittitur or a new trial on the damages awarded for two of the sites. Johnson also moved to amend the judgment to reduce the amount of prejudgment interest. The judge allowed the motion for judgment n.o.v., and dismissed entirely the complaint against Johnson. He denied Johnson's other motions as moot, and also denied the Commonwealth's subsequent motion to set a date for trying its claim that Johnson had violated G. L. c. 93A. Owens also filed motions for judgment n.o.v. or a new trial, but subsequently settled with the Commonwealth. Therefore, Johnson is the only remaining defendant in this action. The Commonwealth appealed from the judge's grant of judgment n.o.v. to Johnson and his dismissal of the Commonwealth's G. L. c. 93A claim, and we granted the Commonwealth's application for direct appellate review. We now reverse the judgment n.o.v., and reinstate the jury's verdict. We conclude that the Commonwealth's G. L. c. 93A claim was properly dismissed. We also conclude that prejudgment interest was properly calculated. We remand for a reconsideration of Johnson's motion for remittitur or a new trial.

We address in turn each of the principal issues on appeal, including (1) Johnson's liability to the Commonwealth for the cost of asbestos removal, (2) the Commonwealth's contention that Johnson is liable as well for having engaged in practices that violated G. L. c. 93A, (3) the proper basis for computing prejudgment interest on the award of damages, and (4)

---

[4]The jury were asked to complete a separate sheet for each site, with a series of special questions. For the claims against Johnson, the questions were:

"1. Did Johnson Insulation install an asbestos-containing product in [the building]?"

"2. Did Johnson furnish the products in accordance with the Commonwealth's specifications?"

"3. Was the product, when it left the control of Johnson Insulation[,] unfit for its intended use?"

"4. Was the unfitness of the product a substantial factor in causing the Commonwealth damage?"

"5. Please state, in words, the amount of the Commonwealth's damages of which removal of the product was a substantial causative factor."

Johnson's objection to the amount of damages imposed on it for asbestos removal at two sites.

1. *Johnson's liability under an implied warranty of merchantability.* The Commonwealth argued at trial that Johnson was liable for breach of the implied warranty of merchantability, as defined by provisions of the Uniform Commercial Code (UCC) governing sales, G. L. c. 106, §§ 2-314 to 2-318. Under the UCC, a warranty that goods are merchantable is implied in a contract for their sale, if the seller is a merchant with respect to goods of that kind.[5] To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." G. L. c. 106, § 2-314 (1), (2) (*c*). Although the notion of warranty is grounded in contract, we have recognized that breach of this implied warranty provides a cause of action in tort where the harm is a physical injury to person or property rather than an "economic" loss of value in the product itself (for which contractual remedies must still be pursued). *Bay State-Spray & Provincetown S.S., Inc.* v. *Caterpillar Tractor Co.,* 404 Mass 103, 107-110 (1989). See *Dighton* v. *Federal Pac. Elec. Co.,* 399 Mass. 687, 691 n.6, cert. denied, 484 U.S. 953 (1987); *Wolfe* v. *Ford Motor Co.,* 386 Mass. 95, 97-100 (1982). We have declined to allow claims for strict liability in tort for defective products, but we have recognized that, by eliminating most contractually-based defenses to the implied warranty of merchantability (such as the requirements of privity and of notice), the Legislature has imposed duties on merchants as a matter of social policy, and has expressed its intent that this warranty should establish liability as comprehensive as that to be found in other jurisdictions that have adopted the tort of strict product liability. *Back* v. *Wickes Corp.,* 375 Mass. 633, 639-640 (1978). *Swartz* v. *General Motors Corp.,* 375 Mass. 628, 629-631 (1978). Liability under this implied warranty is "congruent in nearly all respects with the principles expressed

---

[5]As the supplier of the asbestos-containing product and as its installer, Johnson provided both goods and services to the Commonwealth. We are satisfied that Johnson is a "merchant" with respect to the asbestos product, and is thus subject to G. L. c. 106, § 2-314 (1). See G. L. c. 106, § 2-104 (1) (defining "[m]erchant"), § 2-318. See also *Guzman* v. *MRM/Elgin,* 409 Mass. 563, 569 (1991) (liability for breach of warranty, like liability under Restatement [Second] of Torts § 402A [1965], limited to manufacturer, seller, lessor, or supplier of goods). In its memorandum of law in support of its motion for judgment n.o.v., Johnson implied that it should be viewed as a service provider rather than as a merchant, but it has not pressed this argument on appeal.

in Restatement (Second) of Torts § 402A (1965)." *Back* v. *Wickes Corp.*, *supra* at 640. The Restatement (Second) of Torts, *supra*, takes the position that the seller of "any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property," even though "the seller has exercised all possible care in the preparation and sale of his product." *Id.* at § 402A (1), (2) (a). Thus, a claim for breach of the implied warranty of merchantability should be considered in light of the requirements for warranties contained in G. L. c. 106, §§ 2-314 to 2-318, as well as the principles expressed in § 402A of the Restatement.[6] *Back* v. *Wickes Corp.*, *supra.*

The UCC provides separately for an implied warranty of fitness for a particular purpose, which exists "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." G. L. c. 106, § 2-315. The Commonwealth did not argue that such a warranty existed in this case. As discussed below, the existence of the two separate implied warranties, and of separate defenses to their existence, engenders some confusion and ambiguity in statutes, commentary, and case law.

By way of defense, Johnson contends that it cannot be held liable for having sold the asbestos-containing products, whether or not they were "unreasonably dangerous," because no implied warranty of merchantability existed as to those products. It argues that the warranty never arose, because the products were supplied according to the Commonwealth's plans and specifications. Johnson argues that the Commonwealth specified the products that Johnson was to supply and install, and that it is fundamentally unfair to hold a seller liable for providing a product which it was bound by the buyer's specifications to provide. As indications that it had no discretion in supplying these products, Johnson points out that (1) the specifications were created by design engineers and reviewed by staff of the division of capital planning and operations before the projects

---

[6]On May 20, 1997, the American Law Institute gave final approval to a new formulation of the law of product liability. See Restatement (Third) of Torts: Products Liability (Proposed Final Draft, April 1, 1997). Neither party referred to this Restatement, and we have not considered its applicability to this case.

were put out to bid, (2) Johnson had to obtain approval of the materials it proposed to use, and (3) a "clerk of the works" at each job site ensured that the approved materials were actually installed. Johnson does not cite any specific statutory language as the basis for its defense. We presume here that it relies on G. L. c. 106, § 2-316 (3) (*c*), which provides that an implied warranty can be excluded or modified "by course of dealing or course of performance or usage of trade," and on § 2-317 (*c*), which states that an express warranty (here, Johnson's contractual promise to install the specified materials) displaces an inconsistent implied warranty of merchantability. As support for its position, Johnson cites 1A U.L.A. § 2-316 official comment no. 9, at 467 (Master ed. 1989):

> "The situation in which the buyer gives *precise and complete specifications* to the seller is not explicitly covered in this section, but this is a frequent circumstance by which the implied warranties may be excluded. The warranty of fitness for a particular purpose would not normally arise since in such a situation there is usually no reliance on the seller by the buyer. The warranty of merchantability in such a transaction, however, must be considered in connection with [§ 2-317] on the cumulation and conflict of warranties. Under [§ 2-317 (*c*),] in case of such an inconsistency the implied warranty of merchantability is displaced by the express warranty that the goods will comply with the specifications. Thus, where the buyer gives *detailed specifications* as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications." (Emphasis added.)

Logically, in the circumstances where a buyer specifies the desired goods, in detail, to a seller, the buyer has not relied on the seller's skill and judgment in selecting those goods, and hence, by the terms of § 2-315, a warranty of fitness for a particular purpose does not exist. By contrast, the effect of a buyer's specifications on the warranty of merchantability depends on a number of variables, including the nature and uniqueness of the product, the extent of the buyer's role in product design, the sophistication of the parties, and their prior course of dealing. We conclude that an implied warranty of merchantability did exist for the products supplied by Johnson,

because the specifications supplied by the Commonwealth were not so detailed, precise, and complete as to exclude that warranty.

The specification by a buyer of a brand or trade name does not, by itself, negate an implied warranty of merchantability. See *Taylor* v. *Jacobson*, 336 Mass. 709, 713 (1958); *Poulos* v. *Coca-Cola Bottling Co. of Boston*, 322 Mass. 386, 389 (1948).[7] See also *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N.J. 358, 370-371 (1960). That warranty would lose almost all significance if it ceased to apply any time that a consumer selected or requested a product by brand name. Even if Johnson was in fact bound to supply a product requested by the Commonwealth or lose the sale, all other sorts of manufacturers, distributors, and retailers, from automobile dealers to fast-food vendors, face a similar choice in supplying brand-name products requested or selected by customers. Furthermore, the exhibits and testimony contained in the record indicate that Johnson was not entirely limited to products or manufacturing sources named in the Commonwealth's specifications.[8] Since 1963, to ensure full competition, the Commonwealth's construction contract specifications have been required to allow for the substitution of materials equal to named brands in terms of quality and functional performance. See G. L. c. 30, § 39M (*b*). See also *Sutton Corp.* v. *Metropolitan Dist. Comm'n*, 423 Mass. 200,

---

[7]The cited cases were decided under the language of § 15 (2) of the Uniform Sales Act (G. L. [Ter. Ed.] c. 106, § 17 [2]), which was replaced in this State by the corresponding UCC provision, G. L. c. 106, § 2-314. These cases remain entirely applicable, because the implied warranty of merchantability applies more broadly under the current language of G. L. c. 106, § 2-314 (1) (applying to purchase of goods from "merchant with respect to goods of that kind"), than under the prior wording of G. L. (Ter. Ed.) c. 106, § 17 (2) (warranty where goods are "bought by description" from seller dealing in goods of that description). See 13 Mass. Gen. Laws Ann. 177-178, Massachusetts Code Comment (West 1990). See also 1A U.L.A. § 2-314 official comment no. 3, at 213 (Master ed. 1989) ("A specific designation of goods by the buyer does not exclude the seller's obligation that they be fit for the general purposes appropriate to such goods").

[8]Both sides in this case were hampered by a lack of available documentation as to the work performed by Johnson under its contracts with the Commonwealth. Johnson's records were destroyed in a 1977 fire, and it would appear that the Commonwealth's records were likewise incomplete, making it difficult to establish the time frame and the scope of Johnson's work. Johnson was able to supply contract specifications for just one of the sites on which it was employed, but we do not consider this fatal to its defense, as the jury could have inferred, from testimony, the practices followed at other sites.

208-209 (1996). Johnson acknowledges that the practice of specifying materials in the form "Product A, Product B, or equal" predated the enactment of the statute in 1963.

Johnson cites several cases involving buyer specifications in which the implied warranty of merchantability was held not to apply, but we find these cases inapposite or unpersuasive. In *Cumberland Farms, Inc.* v. *Drehmann Paving & Flooring Co.*, 25 Mass. App. Ct. 530 (1988), structural problems in a dairy plant's brick floor were attributed to the absence of expansion joints across the floor's surface. The plaintiff (a construction company affiliated with the plant's owner) had made the initial contact with the defendant installer, supplied blueprints to it, and informed it that the floor was to be similar to a floor, likewise lacking surface expansion joints, that the defendant had installed previously in another of the plaintiff's facilities. The plaintiff had also rejected the defendant's recommendation that expansion joints be added to the new floor's design. During installation, the plaintiff rejected a similar recommendation from its own construction supervisor. *Id.* at 531-533. The Appeals Court held that the installer was not liable under either of the two possible warranty theories. The court concluded that (1) the implied warranty of fitness for a particular purpose never arose because the plans and specifications had been furnished by the plaintiff, the installer had had no discretion, and the plaintiff had not relied on the installer's expertise, and (2) the implied warranty of merchantability had been displaced by an express warranty, namely, that the floor was to be similar to the one previously constructed. *Id.* at 535-536. We do not accept the analogies that Johnson wishes us to draw between the *Cumberland Farms* case and the action before us. In the *Cumberland Farms* case, the failure of the floor was caused not by the quality of the materials (i.e., bricks) supplied by the installer, nor by a lack of craftsmanship on its part, but by innate flaws in engineering and design that were wholly attributable to the plaintiff. In the present case, the problem is not with the design of the Commonwealth's buildings or with its decision to insulate pipes, but with the materials provided by the installer, products that turned out to have undisclosed and nonobvious defects that rendered them unfit for their ordinary purposes. The asbestos-containing products supplied by Johnson were "off-the-shelf," commercially available goods that were not specially designed or manufactured for the Commonwealth. Cf. *In re Hawaii Fed.*

*Asbestos Cases*, 960 F.2d 806, 810-812 (9th Cir. 1992), citing *Boyle* v. *United Technologies Corp.*, 487 U.S. 500, 507-512 (1988) (contractors supplying asbestos insulation to United States military not immunized from State tort liability for design defects where products supplied were readily available on the commercial market and were not manufactured with special needs of military in mind).

We decline to give such general application as Johnson would like to the Appeals Court's statement in the *Cumberland Farms* case that "[w]hen goods are provided according to plans and specifications furnished by the buyer, the seller does not impliedly warrant their fitness for a particular purpose, and no implied warranty of merchantability arises." *Cumberland Farms, supra* at 535. The limits of the statement are in fact indicated by the court itself, which cites two other cases offering similarly unusual circumstances. In *Rust Eng'g Co.* v. *Lawrence Pumps, Inc.*, 401 F. Supp. 328, 330-331 (D. Mass. 1975), the manufacturer of pumps that were designed for submersion in sulfuric acid, in conformance with specifications supplied by the purchaser, was found not liable when the pumps failed because of excessive abrasives suspended in the acid (an operational condition under the control of the purchaser). Although the judge held that "there can be no recovery for breach of the implied *warranties*," the facts that he emphasized (i.e., the purchaser's complete control of pump specifications and over-all system design, and the absence of reliance on the manufacturer's expertise or past experience) indicate that his primary focus was on the warranty of fitness for a particular purpose (emphasis added). *Id.* at 332-333. In *Blockhead, Inc.* v. *Plastic Forming Co.*, 402 F. Supp. 1017 (D. Conn. 1975), the plaintiff had been deeply involved in designing the defective product and in drawing up specifications for it, and had had prior experience with similar items; the judge decided that these factors ruled out any implied warranty of fitness for a particular purpose. *Id.* at 1020-1025. He also held that the implied warranty of merchantability was excluded, but for a different reason: the plaintiff had examined samples and was experienced enough to have spotted the defect prior to full production. *Id.* at 1025-1026. Cf. G. L. c. 106, § 2-316 (3) (*b*) (no implied warranty for defects which would have been revealed by buyer's examination of sample). Thus, in neither of these cases that the court cited in the *Cumberland Farms* decision was an implied war-

ranty of merchantability negated on the basis that the buyer had furnished plans and specifications, and in both cases the buyer bore significant responsibility for the failure of the materials supplied.[9]

Allowing Johnson's "specifications defense" to negate the implied warranty of merchantability here might create an anomaly in other cases involving brand-name products where both negligence and breach of the implied warranty of merchantability are potential theories for establishing product liability. Even if a buyer's selection of a product by brand name furnished a defense to a breach of warranty claim, the buyer's action would be unlikely to alter the seller's duty of care to the buyer with respect to the product. As a result, the buyer might find it more difficult to recover on a warranty theory than on a theory of negligence. This would undercut the social policy, advanced by the breach of warranty theory, of holding sellers liable for the quality and safety of their products. See *Guzman* v. *MRM/Elgin*, 409 Mass. 563, 568-569 (1991) (goal of strict liability is to place responsibility for defective products on those who manufacture and market them); *Colter* v. *Barber-Greene Co.*, 403 Mass. 50, 61-63 (1988) (warranty liability focuses on whether product defective or unreasonably dangerous, not on conduct of user or seller); *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 353-357 (1983) (contributory or comparative negligence not defense to action for breach of warranty); *Back* v. *Wickes Corp.*, 375 Mass. 633, 642 (1978) (warranty inquiry focuses on product characteristics rather than defendant's conduct). See also W.L. Prosser & W.P. Keeton, Torts §§ 97, 98

---

[9]Johnson cites two additional cases from other jurisdictions. In *Board of Educ. of Clifton* v. *W.R. Grace Corp.*, 258 N.J. Super. 94 (1992), an installer of asbestos tiles was granted summary judgment on claims for express warranty, implied warranty (the decision does not indicate which implied warranty was at issue), and strict liability in tort. That case is distinguishable from the present case on a number of factual and legal grounds. For example, the installer in that case was viewed by the court as a service provider, not a seller (manufacturers and distributors of the asbestos products remained parties to the suit). *Id.* at 125-128. In contrast, we consider Johnson to have been a distributor and seller, as well as an installer. See note 5, *supra*. Similarly, in *Leininger* v. *Stearns-Roger Mfg. Co.*, 17 Utah 2d 37 (1965), where summary judgment was granted to the installer of an industrial fan that exploded years later due to a defect in its design, the court emphasized that the defendant had been retained by the plaintiff merely to install a product that the defendant had not designed, manufactured, recommended, or sold. *Id.* at 41, 43.

(5th ed. 1984); Restatement (Second) of Torts, *supra* at § 402A comment c.

The jury's findings in this case are not inconsistent with our conclusion that an implied warranty of merchantability existed for the products supplied by Johnson to the Commonwealth. One of the special questions posed to the jury for each site was, "Did Johnson furnish the products in accordance with the Commonwealth's specifications?" The jury responded affirmatively for all but one site. The judge based his decision to grant judgment n.o.v. on the jury's responses to this question. However, the jury's responses established only that Johnson supplied the products called for in its contracts and followed the specified procedures for installation. The jury were not asked whether the Commonwealth's specifications were "precise and complete." There is no inconsistency between those findings and our conclusion that, as matter of law, the Commonwealth's specification of brand-name products did not exclude or modify the implied warranty of merchantability.

Having concluded that an implied warranty of merchantability did exist, we proceed to consider whether a reasonable basis existed for the jury's affirmative findings that the asbestos-containing product furnished and installed by Johnson at twenty-one sites was unfit for its intended use. Our standard of review is "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' . . . In applying this standard, we examine the evidence in the light most favorable to the plaintiff." *Forlano* v. *Hughes*, 393 Mass. 502, 504 (1984), quoting *Miles* v. *Edward O. Tabor, M.D., Inc.*, 387 Mass. 783, 786 (1982).

As discussed above, we have equated a breach of the implied warranty of merchantability, that goods be "fit for the ordinary purposes for which such goods are used," G. L. c. 106, § 2-314 (2) (*c*), with the sale of an "unreasonably dangerous" product, see Restatement (Second) of Torts, *supra* at § 402A (1). See *Hayes* v. *Ariens Co.*, 391 Mass. 407, 412-413 (1984); *Back* v. *Wickes Corp.*, *supra* at 639-640. An article is not unreasonably dangerous merely because some risk of harm is associated with its use, but only where it is dangerous "to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts,

*supra* at § 402A comment i, at 352. A product may be unreasonably dangerous because of a defect in design. See *Back* v. *Wickes Corp.*, *supra* at 640-642 (manufacturer must anticipate environment in which product will be used; where design defect is alleged, "fitness" is to be judged by social acceptability, considering such factors as consumer expectations, degree of danger, feasibility and cost of alternative designs, and adverse consequences of alternatives). Alternatively, a product may be considered to be unreasonably dangerous because of the absence of an adequate warning, sufficient to alert those who may be sensitive to the product and to allow users to balance the risk of harm against the product's social utility. See *Borel* v. *Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1088-1089 (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974); Restatement (Second) of Torts, *supra* at § 402A comments j, k. In this action, both the Commonwealth and Johnson focused on the "failure to warn" basis for finding a product unreasonably dangerous, and we therefore address only that issue.[10, 11]

The jury could reasonably have found that Johnson's products were unfit for their ordinary purposes, based on the evidence presented at trial concerning the absence of adequate warnings as to the dangers of exposure to asbestos.[12] The Commonwealth introduced, as exhibits, product brochures and other descriptive materials that contained no warnings as to the dangers posed by even low levels of exposure to installed asbestos. It also

[10]At trial, the Commonwealth attempted to raise a theory of defective design, but the judge rejected the Commonwealth's efforts to introduce evidence of available asbestos-free insulation products that were comparable in function to the asbestos-containing products supplied by Johnson. The judge's position, apparently, was that the evidence related to "state of the art" and was therefore not relevant to determining Johnson's duty to warn, according to *Hayes* v. *Ariens Co.*, 391 Mass. 407, 413 (1984) (state of the art for discoverability of risk irrelevant to assessing adequacy of vendor's warning). Because we decide favorably to the Commonwealth on the absence of adequate warning, we need not consider its contention that the judge erred in excluding evidence of defective design.

[11]Johnson argues that the Commonwealth failed to preserve for appeal the issue of Johnson's failure to warn the Commonwealth of the danger of asbestos. This contention is without merit. The Commonwealth presented evidence at trial on this issue and argued it to the jury, objected to the judge's failure to charge on the issue, and referred to the issue in its response to Johnson's motion for judgment n.o.v.

[12]Because the Commonwealth sought to prove that the implied warranty of merchantability had been breached, it bore the burden of proving a negative, namely the lack of adequate warning as to the dangerousness of the product. See *Hayes* v. *Ariens Co.*, *supra* at 414.

introduced an interrogatory in which Johnson acknowledged that "[n]o specific warnings, advice or requirements [were] given regarding preparing, installing, [or] applying . . . asbestos-containing materials to the plaintiff." This appears to address only the potential immediate hazards to workers handling the material during installation, and not the long-term dangers of exposure to in-place asbestos that in fact necessitated the Commonwealth's asbestos removal programs. However, the jury could have reasonably inferred from this response that Johnson had offered no warnings of long-term hazards, either.[13]

In summary, an implied warranty of merchantability existed for the products supplied by Johnson to the Commonwealth, notwithstanding Johnson's defense that it was bound by the Commonwealth's specifications. The absence of adequate warnings as to the hazards of asbestos rendered those products unreasonably dangerous, in breach of that warranty. The judge's decision to grant judgment n.o.v. must therefore be reversed, and the jury's verdict reinstated. There was no inconsistency between the jury's findings that products were furnished according to the Commonwealth's specifications and their findings that those products were unfit for their ordinary purpose.

2. *Dismissal of G. L. c. 93A claim.* As has been mentioned, the Commonwealth's complaint against Johnson (and the other original defendants) had included a claim for violations of the consumer protection statute, G. L. c. 93A. When, in response to Johnson's posttrial motions, the judge granted judgment n.o.v. to Johnson on the award of damages for breach of the implied warranty of merchantability, he also ordered that the complaint against Johnson be dismissed, with prejudice. This order implicitly dismissed the Commonwealth's G. L. c. 93A claim, which had not yet been tried. In denying the Commonwealth's subsequent motion that he vacate his order, the judge noted,

---

[13]On the issue of a lack of adequate warning, Johnson challenges (as it did at trial) the sufficiency of the Commonwealth's proof, and not the presupposition that its duty (if any) to warn extended to the long-term hazards of low-level exposure to in-place asbestos. We therefore do not need to consider how the duty to warn standard suggested in *Hayes* v. *Ariens Co.*, 391 Mass. 407, 413 (1984), would apply to the facts of this case. We note that it is a matter of some dispute as to when the dangers of asbestos became either known or scientifically discoverable. See *Borel* v. *Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1083-1086 (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974) (reviewing history of knowledge as to risks of exposure to asbestos).

"The court having granted [Johnson] judgment notwithstanding the verdict, nothing remains for adjudication." Because we have concluded that the jury's verdict should be reinstated, we must now consider whether the Commonwealth is entitled to a trial on its G. L. c. 93A claim. Its objective in such a trial, it acknowledges, would be to seek to have the jury's damages award multiplied on the basis of knowing and wilful violations of G. L. c. 93A by Johnson, and to seek an award of attorney's fees. We conclude that the Commonwealth's G. L. c. 93A claim is time-barred by the applicable statute of limitations, and that the judge was therefore correct in dismissing this claim.[14]

The timeliness of the Commonwealth's G. L. c. 93A claim is controlled by St. 1986, c. 336, entitled "An Act establishing a limitation of actions involving asbestos removal." Section 1 of the act (codified at G. L. c. 260, § 2D) established a six-year limitations period within which the Commonwealth and other specified public entities could commence actions "to recover any costs associated with asbestos related corrective actions including, but not limited to, the removal and replacement of asbestos and materials containing asbestos." Section 2 of St. 1986, c. 336 (not codified), allowed such an action to be brought any time prior to July 1, 1990, even if the action would otherwise be barred under the six-year limitations period. The effect of the statute was to revive asbestos claims on which the statute of limitations had already run. The record in this case indicates that, by 1982, the Commonwealth had already identified the presence of asbestos in many public buildings. Without this statute, actions to recover the costs of asbestos removal would, in most cases, have been time-barred under the three-year statutory period established in G. L. c. 260, § 2A, even allowing for potential application of the discovery rule. This particular action was commenced on June 28, 1990, just a few days before the extended cut-off date.

---

[14]Because we reach this conclusion, we need not consider the substantive merits of the Commonwealth's G. L. c. 93A claim or other potential procedural hurdles, such as whether the Commonwealth's claim may properly be brought under G. L. c. 93A, §§ 9 or 11, or both.

We note that the defendants moved to dismiss this claim at an early point in the litigation. At that time, the judge reached a conclusion similar to ours, that St. 1986, c. 336, did not apply to such a claim. He nonetheless denied the motion to dismiss, but only because he thought it possible that facts might exist to support an argument for tolling the statute of limitations on some other basis. The Commonwealth has made no such argument.

The Commonwealth contends that its claim under G. L. c. 93A was brought to recover "costs associated with asbestos related corrective actions including, but not limited to, the removal and replacement" of asbestos-containing products, and therefore the extended limitations period created by St. 1986, c. 336, should apply to the Commonwealth's G. L. c. 93A claim. We disagree. We conclude instead that the Legislature extended the limitations period to allow the recovery by public entities of only the actual costs of asbestos removal, replacement, or other remediation, not to allow the pursuit of multiple damages and attorney's fees against asbestos companies for allegedly engaging in practices prohibited under G. L. c. 93A. In an earlier case addressing the constitutionality of the retroactive application of St. 1986, c. 336, we identified the Legislature's objective as that of "protecting the public treasury against the monumental cost of removing and replacing asbestos in public buildings," and concluded that it was in the public interest for there to be a "right of reimbursement" for "asbestos corrective measures" to remedy the threat to public health posed by the presence of asbestos. *Boston* v. *Keene Corp.*, 406 Mass. 301, 309, 312-313 (1989). Consistent with our analysis in that case, we conclude here that the "costs associated with asbestos related corrective actions" that were the object of the Legislature's concern are those expenditures directly required to eliminate the physical hazards posed by the presence of asbestos. Attorney's fees are not such expenditures, nor are multiple damages that are essentially punitive, rather than compensatory, in nature. See *McEvoy Travel Bur., Inc.* v. *Norton Co.*, 408 Mass. 704, 717 (1990). The judge did not err in dismissing the Commonwealth's G. L. c. 93A claim.

3. *Prejudgment interest.* In the judgment entered on July 21, 1995, after the jury had rendered their verdict, Johnson was ordered to pay $2,012,169.60 in damages, plus $1,222,151.50 in interest on the damages, calculated from the commencement of the action on June 28, 1990. The imposition of interest was in accordance with G. L. c. 231, § 6B, which provides that the clerk of the court shall add interest, at a twelve per cent per annum rate, to the amount of damages "[i]n any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property . . . ." In its posttrial motion to amend the judgment, Johnson argued

that prejudgment interest should only be charged on that portion of the damages that represented the asbestos removal costs already incurred by the Commonwealth before the date of judgment, and not on the cost of abatement projects that had yet to be undertaken. After he granted judgment n.o.v. on the award of damages, the judge denied as moot Johnson's motion to amend the judgment. Our decision to reinstate the jury's verdict, and thus the award of damages, renews the issue of the proper calculation of interest. Recognizing that the award of damages might be reinstated, both parties addressed the subject of prejudgment interest in their appellate briefs. For the sake of judicial economy, we therefore address this issue. We conclude that interest was properly calculated on the entire amount of damages, for the period from the commencement of the action to the entry of judgment.

Johnson characterizes projected abatement costs as costs associated with "future damages," for which, it argues, prejudgment interest should not be assessed. See *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 389-391 (1988) (in employment discrimination action, prejudgment interest not to be assessed on damages for "front pay," i.e., lost future earnings and benefits occurring after date of judgment). In so doing, Johnson blurs some necessary distinctions, and thereby arrives at an incorrect conclusion.

The cost of asbestos abatement, whether already incurred by the Commonwealth or merely projected, is not itself the damage or injury suffered by the Commonwealth, but is rather a measurement of the appropriate compensation for that damage. See Black's Law Dictionary 389 (6th ed. 1990) (distinguishing "damage," a loss or injury to person or property, from "damages," the money compensation for such loss). The injury to the Commonwealth's property occurred when asbestos-containing products were installed in its buildings. Any damages to which the Commonwealth was entitled, whatever that amount might be and whenever it might be awarded, was due from the moment of injury. See *USM Corp.* v. *Marson Fastener Corp.*, 392 Mass. 334, 348 (1984) (in the typical tort action, "damages accrue at the time of the tortious injury").[15] The Commonwealth's projected abatement costs are not "future damages," but are

---

[15]This principle is not contradicted by the fact that G. L. c. 231, § 6B, allows interest from the commencement of the action, and not from the date of the injury. The statute provides an incentive for a plaintiff to pursue a claim

rather an estimation of damage that has already occurred, for which compensation is already due. The cost of repairs is the outlay necessary to restore property to its preinjury condition; in undertaking a repair, the injured party substitutes one measure of damages, a cash outlay, for another measure, the diminution in the property's value occasioned by the injury. See *Trinity Church in the City of Boston* v. *John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 48-49 (1987) (methods for measuring damages include diminution in market value, the cost of reproduction less depreciation, and replacement or restoration costs); *Belkus* v. *Brockton*, 282 Mass. 285, 288 (1933) (where injury reasonably curable by repairs, expense of repairs is measure of recovery); *Commonwealth of Puerto Rico* v. *SS Zoe Colocotroni*, 628 F.2d 652, 672-675 (1st Cir. 1980) (for measure of damages, reasonable cost of restoring area damaged by oil spill can be substituted for diminution in value); Restatement (Second) of Torts § 929 (1) (a) (1979) (damages for "harm to land" include compensation for difference in value before and after the harm, or reasonable cost of restoration). Whether measured by repair cost or diminution in value, the damage has already been suffered, and future events merely place a cash value on the extent of the loss (either through an expenditure for repair, or through the sale of the damaged property for a lower price than would have been received had the damage not occurred).[16] Similarly, in the case of personal injury, prejudgment interest is to be awarded for the

speedily, and offers the benefit of administrative convenience. See *Bernier* v. *Boston Edison Co.*, 380 Mass. 372, 388-389 (1980) (in judgment against defendants added after the running of the statutory period, interest still runs from commencement of action); *Charles D. Bonanno Linen Serv., Inc.* v. *McCarthy*, 550 F. Supp. 231, 246-247 (D. Mass. 1982), aff'd in part (on this point), and rev'd in part, 708 F.2d 1 (1st Cir.), cert. denied, 464 U.S. 936 (1983) (award of interest for postfiling damages not windfall, as it balances absence of interest during prefiling period on damages incurred before commencement of action). Compare G. L. c. 231, § 6C (in contract actions, interest to be computed from date of breach or demand, if established, and otherwise from date of commencement of action).

[16]*Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837 (1986), which Johnson cites for the principle that interest is not due on losses to be incurred in the future, is inapposite, as it involves G. L. c. 231, § 6C, which provides for interest to be imposed in *contract* actions from the date (if identifiable) of the breach or demand. Moreover, that case did not, in fact, involve a differentiation between present and future losses, but rather the identification of the breach for which compensation was due. The case involved an insurer's improper refusal to defend the insured in litigation; we concluded that, because damages had been awarded for the breach of the insurer's duty to pay the

loss of earning capacity, even though it is future income that is affected by that loss. See *Griffin* v. *General Motors Corp.*, 380 Mass. 362, 367 (1980); *Carey* v. *General Motors Corp.*, 377 Mass. 736, 746 (1979). See also *Conway* v. *Electro Switch Corp.*, *supra* at 391 n.9, citing *Carey*, *supra* (loss of earning *capacity* is present loss, but lost earnings and benefits occurring after date of judgment are future damages to which G. L. c. 231, § 6B, does not apply); *Kuppens* v. *Davies*, 38 Mass. App. Ct. 498, 499-501 (1995) (in tort action for personal injury, compensation for future lost wages is already incurred loss of earning capacity).

The award of interest was properly calculated on the full amount of damages. As we discuss next, Johnson seeks remittitur or a new trial on portions of the award. If, on remand, the amount of damages is reduced, then prejudgment interest would, of course, have to be recalculated.

4. *Johnson's motion for remittitur or a new trial.* As mentioned above, in addition to its posttrial motion for judgment n.o.v., Johnson filed a motion for remittitur or, in the alternative, a new trial on damages, pursuant to Mass. R. Civ. P. 59 (a). Johnson argued that, with respect to two of the sites for which the jury had awarded damages, the jury verdicts were against the weight of the evidence, and "were excessive, shock the conscience in light of the testimony and evidence presented and, if allowed to stand, would represent a miscarriage of justice." The challenged verdicts awarded $788,007.05 for the power plant and steam lines at the North Central Correctional Institution at Gardner, and $577,579.77 for the steam tunnels at the University of Massachusetts at Amherst. After granting judgment n.o.v., the judge denied this additional motion as moot.[17] An excessive award of damages is grounds for a new trial; under rule 59 (a), a new trial is not to be granted until the

insured's bills and not for the preceding breach of the duty to defend, interest should be computed just from the dates when the insured had paid the bills itself. *Id.* at 841-842.

[17]In denying the motion for a new trial as moot, the judge did not adhere to the requirements of Mass. R. Civ. P. 50 (c) (1), 365 Mass. 814 (1974), which provides that if judgment n.o.v. is granted, "the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial." This rule is intended to reduce the length of litigation by allowing the appellate court to review contemporaneously a judge's decisions on a motion for judgment n.o.v. and

prevailing party is first given the opportunity to consent to remittitur. The allowance of a new trial is within the judge's discretion, and an appellate court will not find an abuse of discretion in the judge's refusal to grant a new trial unless the damages awarded were greatly disproportionate to the injury proved or represent a miscarriage of justice. *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 787 (1975). *Bartley* v. *Phillips*, 317 Mass. 35, 41-43 (1944).

It is obvious to us that the judge's denial of Johnson's motion for a new trial was a procedural decision, made without regard to the merits of Johnson's arguments.[18] Because the judge has neither accepted nor rejected the substance of Johnson's motion for a new trial, no decision has yet been reached that warrants our review. Johnson shall have thirty days from the entry of the rescript to renew its motion for remittitur or a new trial with

---

for a new trial. The rule does not prescribe what action should be taken when a judge has not followed the rule (whether by making no ruling at all, or, as here, by denying the motion without considering its merits). The Commonwealth argues that Johnson has abandoned its motion for a new trial by failing to obtain a ruling on it. See *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 575 (1986) (remand not required where moving party has failed to insist on a ruling on motion for new trial). In cases implicating the parallel Federal rules, an appellate court that has reversed a judgment n.o.v. has sometimes reinstated the verdict without remanding for reconsideration of the motion for a new trial. Courts have been most inclined to do so when the moving party has acquiesced in a judge's decision to take the new trial motion under advisement and has also failed to raise the issue on appeal, particularly where the sufficiency of the evidence was the principal issue involved in both posttrial motions. See, e.g., *Arenson* v. *Southern Univ. Law Ctr.*, 43 F.3d 194, 196-198 (5th Cir. 1995); *Anheuser-Busch, Inc.* v. *L & L Wings, Inc.*, 962 F.2d 316, 322-323 n.3 (4th Cir.), cert. denied, 506 U.S. 872 (1992); *Oberman* v. *Dun & Bradstreet, Inc.*, 507 F.2d 349, 353 (7th Cir. 1974). However, we decline to follow that course of action here, where the judge did, technically, rule on the motion, Johnson did raise the issue on appeal in its brief, and different issues are involved in the two motions. In another instance where the judge denied a motion for a new trial in light of his grant of judgment n.o.v. and we subsequently reversed the judgment n.o.v., we remanded for reconsideration of the new trial motion. *Tower* v. *Hirschhorn*, 397 Mass. 581, 589 (1986). See *Clements* v. *General Acc. Ins. Co.*, 821 F.2d 489, 493 (8th Cir. 1987) (similar procedural sequence).

[18]This assessment of the judge's intention in denying the motion as moot is supported by subsequent procedural events. After the judge granted judgment n.o.v. and denied Johnson's posttrial motions for a new trial and an amended judgment, the Commonwealth moved that the judge vacate the order for judgment n.o.v. and make a "provisional ruling" on the merits of Johnson's motions. The judge denied those motions, noting that "the court having granted [judgment n.o.v.], nothing remains for adjudication."

respect to the two challenged awards, so that the judge may make a determination on remand as to the merits of Johnson's motion. This is the procedure that we have prescribed before in similar circumstances. See *Tower* v. *Hirschhorn*, 397 Mass. 581, 589 & n.11 (1986).

*Conclusion.* The judge's order granting judgment n.o.v. is reversed, and the jury's verdict awarding damages to the Commonwealth is reinstated. The Commonwealth's claim under G. L. c. 93A is barred by the statute of limitations and was properly dismissed. Johnson is to be allowed to renew its motion for remittitur or a new trial, with respect to the jury's award of damages for the power plant and steam lines at the North Central Correctional Institution at Gardner and the steam tunnels at the University of Massachusetts at Amherst. Prejudgment interest was properly awarded on the entire amount of damages, from the date of the commencement of the action. If the amount of damages is changed in response to Johnson's motion, prejudgment interest shall be recalculated accordingly. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*