**Jessica C. RULE, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**FORT DODGE ANIMAL HEALTH, INC., and Wyeth Corporation, Defendants.**

Civil Action No. 06–10032–DPW.

United States District Court,
D. Massachusetts.

March 11, 2009.

Noah N. Rosmarin, John P. Zavez, Adkins, Kelston and Zavez, P.C., Boston, MA, for Plaintiff.

John J. Butts, Gabrielle R. Wolohojian, Wilmer Hale LLP, Boston, MA, Joshua R. Cawer, Paul Frank & Collins, Burlington, VT, for Defendants.

## MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

In what appears to be an adaptation of *The Adventure of Silver Blaze*,[1] scripted for presentation as a complaint initiating a civil action, this case has as its protagonist Luke, a German Shepherd who suffered no harm. Luke's owner, plaintiff Jessica C. Rule, undertakes to bring a class action against the manufacturer of allegedly risky heartworm medicine that she administered to Luke, although she was unaware at the time that Luke faced any increased risk from the product. The complaint consists of a dog's breakfast of products liability, contract, and consumer protection claims under Massachusetts law. The common law and warranty claims will be dismissed principally because Rule has failed to allege any cognizable actual injury. And, although Massachusetts case law construing the meaning and significance of the term "injury" under Mass. Gen. Laws ch. 93A remains to some degree unsettled, I find no basis for extending the coverage of Chapter 93A to a claim involving a curious incident in which nothing has happened to the putative class representative's dog. Accordingly, I will grant the defendants' motion to dismiss.

## I. BACKGROUND

Plaintiff Jessica C. Rule commenced this action, individually and on behalf of all others similarly situated, against Defendants Fort Dodge Animal Health, Inc. and

---

1. A. Conan Doyle, *The Adventure of Silver Blaze*, 4 STRAND 645 (1892) *in* 2008 GREEN BAG ALM. 235.

Wyeth Corporation, seeking economic damages suffered from the purchase and injection of their pet dogs with ProHeart® 6 to prevent heartworm. The Complaint alleges five causes of action: Negligence (Products Liability and Failure to Warn) (Count I); Breach of Implied Warranty of Fitness (Count II); Breach of Implied Warranty of Merchantability (Court III); Breach of Contract (Count IV); and Violation of Mass. Gen. Laws ch. 93A (Count V). Defendants have moved to dismiss all claims.

Rule purchased ProHeart® 6 (moxidectin) and had her dog Luke injected with it two times during the period from 2002 to 2003. ProHeart® 6 is a heartworm preventative that was manufactured, distributed and/or sold by Defendants. Unlike Defendants' ProHeart®, which is orally administered to dogs on a monthly basis, ProHeart® 6 was designed to be injected by a veterinarian and to have a preventive effect of 6 months.

As part of the marketing of ProHeart® 6, Defendants issued "The ProHeart® 6 Complete Control Guarantee": [2]

Fort Dodge Animal Health will reimburse 100% of all diagnostic and treatment-related expenses for any dog properly treated with ProHeart® 6 that develops heartworm disease. In addition, Fort Dodge Animal Health will provide to the client through his or her veterinarian another injection of ProHeart® 6 at no cost.

Terms and Conditions

● Dogs less than six months of age are not eligible for the guarantee.

● Dogs over six months of age must have a negative antigen test on the day of initial treatment with ProHeart® 6, followed by a negative antigen test six months after treatment, and then they are fully covered. This allows for development of any pre-existing infection.

● Dogs must be treated with ProHeart® 6 according to the product label. Treatment interval must coincide with the commonly accepted heartworm treatment season in the state(s) where the dog resides or has been travelling.

● Upon diagnosis, Fort Dodge Animal Health Professional Services Department must be contacted immediately at (800) 533–8536. A precurative blood sample must be available.

● Diagnostic and treatment expenses exceeding $450 must be pre-approved by Fort Dodge Animal Health Professional Services.

● Fort Dodge Animal Health reserves the right to amend, modify or terminate this complete control guarantee at any time without notice.

● Guarantee void where prohibited by law.

On or about September 3, 2004, Defendants recalled ProHeart® 6 in response to a request by the Food and Drug Administration ("FDA") due to reported adverse reactions among dogs injected with the product, including in some cases death. Rule alleges that Defendants failed to warn consumers adequately that initial field testing conducted prior to the introduction of ProHeart® 6 had resulted in adverse health effects to some of the test animals. She also alleges that after the

**2.** "Under First Circuit precedent, when 'a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged),' then the court can review it upon a motion to dismiss." *Alternative Ener-* *gy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir.2001) (*quoting Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir.1998)). That is the case with the Guarantee here.

introduction of ProHeart® 6, Defendants failed to warn consumers adequately that they were receiving numerous reports of dogs suffering adverse reactions.

There is no allegation that Luke ever developed heartworm or that he has suffered any adverse reactions from receiving ProHeart® 6. Rule claims, however, that Defendants caused economic damage to her and others similarly situated, as measured by the difference between the actual value of ProHeart® 6 and what its value would have been if it had not been defective. Rule also claims that as a direct and foreseeable consequence of breaching the Guarantee, Defendants damaged the putative class by an amount equal to the veterinary costs that any class member has paid or will have to pay in the future to prevent his or her dog from developing heartworm.

## II. DISCUSSION

■ The standard for granting a motion to dismiss is an exacting one: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *McLaughlin v. Boston Harbor Cruise Lines, Inc.,* 419 F.3d 47, 50 (1st Cir.2005) (*quoting Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Nevertheless, "Rule 12(b)(6) is not entirely a toothless tiger." *Dartmouth Review v. Dartmouth Coll.,* 889 F.2d 13, 16 (1st Cir.1989). I find Rule 12(b)(6) has bite in the canine realm of the animal kingdom as well.

## A. Products Liability and Failure to Warn—Count I

In Count I, Rule alleges that ProHeart® 6 was defective because Defendants failed to warn consumers adequately of the potential adverse health effects to dogs treated with the product.[3] According to Rule, Defendants were aware of the potential adverse effects, which resulted in the deaths of some dogs, both from field testing conducted before the product's release and from customer reports after the product's release. (Complaint ¶¶ 8, 10.) Rule contends that Defendants' failure to warn proximately caused economic damage to her, and to members of the putative class, as measured by the difference between the actual value of the defective ProHeart® 6 and the value the product *would* have had if it had not been defective. (*Id.* ¶ 30.)

■ Massachusetts law follows the traditional "economic loss rule," under which "purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." *FMR Corp. v. Boston Edison Co.,* 415 Mass. 393, 395, 613 N.E.2d 902 (1993). This is consistent with the Restatement, which calls for recovery for economic loss in products liability tort actions only where that economic loss is "caused by harm to: (a) the plaintiff's person; (b) the person of another when harm to the other interferes with an interest of the plaintiff protected by tort law; or (c) the plaintiff's property other than the defective product itself." Restatement (Third)

---

3. The Restatement provides a comprehensive definition of product defect: "A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product ... is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe." Restatement (Third) of Torts: Products Liability § 2 (1998).

of Torts: Products Liability § 21 (1998). The rationale for the economic loss rule is that when a commercial product fails without harming persons or other property, "the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." *E. River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 870, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). *See also* Restatement (Third) of Torts: Products Liability § 21 cmt. a ("[P]roducts liability law lies at the boundary between tort and contract. Some categories of loss, including those often referred to as 'pure economic loss,' are more appropriately assigned to contract law.... [S]ome forms of economic loss have traditionally been excluded from the realm of tort law even when the plaintiff has no contractual remedy for a claim.").

Rule argues, based on a misreading of *Garweth Corp. v. Boston Edison Co.*, 415 Mass. 303, 613 N.E.2d 92 (1993), that the Massachusetts economic loss rule is limited to cases where the defendant interfered with a contract or economic opportunity. The *Garweth* court stated that "[t]he traditional economic loss rule provides that, when a defendant interferes with a contract or economic opportunity due to negligence and causes no harm to either the person or property of the plaintiff, the plaintiff may not recover for purely economic losses." *Id.* at 306, 613 N.E.2d 92. In context within the *Garweth* opinion, this statement was clearly intended simply as an application of the general economic loss rule to the particular circumstances of that case, where the plaintiff had in fact alleged that the defendant had negligently interfered with the plaintiff's contractual relations. The *Garweth* court elsewhere more broadly defined the economic loss rule as "limiting recovery for economic losses in

tort-based strict liability or negligence cases absent personal injury or physical damage to one's property." *Id.* at 305, 613 N.E.2d 92.

■ In this case, Rule acknowledges that she "seeks redress solely for economic damages." (Complaint ¶ 1.) Rule does not claim that Luke ever became infected with heartworm or suffered any adverse consequences from twice being injected with ProHeart® 6. Nor does she claim that the allegedly defective product harmed her personally. Because Rule has not alleged any personal injury or property damage, I find that her products liability claim based on negligence is barred by the economic loss rule, and I will consequently dismiss Count I.

### B. Breach of Implied Warranty of Merchantability—Count III

In Count III, Rule alleges a different products liability theory: that Defendants breached the implied warranty of merchantability because ProHeart® 6 was not reasonably suitable for the ordinary uses for which heartworm preventatives are sold. (Complaint ¶ 36.) Rule claims that this lack of suitability proximately caused economic damage to her, and to members of the putative class, as measured by the difference between the actual value of the product and what its value would have been if it had been as warranted. (Complaint ¶ 38.)

■ Under Massachusetts law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Mass. Gen. Laws ch. 106, § 2–314(1). In order for goods to be considered "merchantable," they "must at least be such as ... are fit for the ordinary purposes for which such goods are used." *Id.* § 2–314(2)(c). A seller breach-

es the implied warranty of merchantability "when a product that is 'defective and unreasonably dangerous' for the '[o]rdinary purposes' for which it is 'fit' causes injury." *Haglund v. Philip Morris, Inc.,* 446 Mass. 741, 746, 847 N.E.2d 315 (2006) (internal citations omitted).[4] I understand Rule's complaint to allege that ProHeart® 6 was "unreasonably dangerous" both because its use involved a risk of harm to consumers' dogs "beyond that which would be contemplated by the ordinary consumer who purchases it," and also because Defendants failed to provide "an adequate warning, sufficient ... to allow users to balance the risk of harm against the product's social utility." *Commonwealth v. Johnson Insulation,* 425 Mass. 650, 661, 682 N.E.2d 1323 (1997) (internal quotations omitted). The critical issue on this motion to dismiss is whether Rule has adequately alleged that the product caused a cognizable "injury."

Rule claims that she and the putative class members suffered an "injury" that was purely economic, and that Defendants are liable for the difference between the value of ProHeart® 6 as it was provided to the class members and the value of the product as it was warranted (i.e., its value if it had not posed unreasonable health risks to dogs who were treated with it). The Massachusetts Supreme Judicial Court has described this method of measuring damages as "a variation on the traditional 'benefit of the bargain' rule that awards a defrauded party the monetary difference between the actual value of the product at the time of purchase and what its value would have been if the representations had been true." *Aspinall v. Philip Morris Cos., Inc.,* 442 Mass. 381, 399, 813 N.E.2d 476 (2004); *see also* Mass. Gen. Laws ch. 106, § 2–714(2) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted....."). Rule's identification of this particular method of measuring damages, however, does not by itself establish that she suffered a legally cognizable "injury."

Unlike the typical breach of warranty case, Rule does not allege that the product she purchased ever failed to perform as warranted. Rule does not contend, for example, that Luke developed heartworm despite being injected with ProHeart® 6, or that Luke suffered any adverse health effects as a consequence of the injections. By contrast, in most breach of warranty cases where the plaintiff alleges a purely economic injury, the defect of the product in question has clearly manifested itself to the plaintiff's detriment, whether in terms of lost profits, repair costs, or the diminished opportunity to use the purchased product. *See, e.g., Bay State–Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor Co.,* 404 Mass. 103, 107, 533 N.E.2d 1350 (1989) (breach of implied warranty where malfunction of a ship's engine resulted in lost profits and required repair costs); *Jacobs v. Yamaha Motor Corp.,* 420 Mass. 323, 324, 649 N.E.2d 758 (1995) (breach of implied warranty where the plaintiff brought his motorcycle to the dealer for repairs fifteen times within a year after purchase, then sought to revoke his acceptance of the purchase). In fact, courts in many jurisdictions have held that a plaintiff *must* demonstrate an actual manifestation of the alleged defect to sustain a cause of action for breach of the implied warranty of mer-

---

**4.** Actions for breach of the implied warranty of merchantability under Massachusetts law "are the functional equivalent of strict liability in other jurisdictions." *Cigna Ins. Co. v. Oy Saunatec, Ltd.,* 241 F.3d 1, 15 (1st Cir. 2001).

chantability. *See, e.g., Briehl v. Gen. Motors Corp.,* 172 F.3d 623, 627–28 (8th Cir. 1999) (collecting cases); *see also O'Neil v. Simplicity, Inc.,* 553 F.Supp.2d 1110, 1115 (D.Minn.2008) ("[T]he plaintiff must instead allege an actual manifestation of the defect that results in some injury in order to state a cognizable claim for breach of warranty."); *Jarman v. United Indus. Corp.,* 98 F.Supp.2d 757, 767–68 (S.D.Miss. 2000) ("[U]nless there is actually a failure in product performance, there is no basis at all for claiming that the plaintiff has been damaged in any way."); *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 460 (D.N.J.1998) ("In most jurisdictions, the courts recognize that unless a product actually manifests the alleged defect, no cause of action for breach of express or implied warranty or fraud is actionable.").

Rule relies heavily on *Holtzman v. Gen. Motors Corp.,* No. 021368, 2002 WL 1923883 (Mass.Super.Ct. July 2, 2002), a Massachusetts Superior Court case that denied dismissal of a breach of warranty claim, despite the fact that "[n]one of the plaintiffs allege that his or her [car] jack has failed, or even that s/he has used it." *Id.* at *1. In *Holtzman,* the plaintiffs alleged that car jacks they purchased had been manufactured in violation of industry standards, "and that their propensity to fail left users 'in great danger' of being killed, or injured, or at least stranded with an inoperable vehicle." *Id.* at *2. Acknowledging that other jurisdictions had dismissed similar cases, the *Holtzman* court held that under Massachusetts law, a buyer who receives goods that are unfit for ordinary use is entitled to a variety of remedies, irrespective of whether the defect has manifested itself. This includes a plaintiff seeking "purely economic" damages "consisting of the difference, at the time and place of acceptance, between the value of the goods as delivered versus as

warranted." *Id.* (*citing* Mass. Gen. Laws ch. 106, § 2–714(2)).

This case, however, is readily distinguishable from *Holtzman* because the product Rule purchased has already fulfilled its anticipated useful life. The plaintiffs in *Holtzman* still possessed and had a justifiable expectation of being able to continue using car jacks that were unreasonably unsafe; Rule by contrast has fully completed the intended usage of Pro-Heart® 6: she twice injected her dog, her dog did not develop heartworm during the warranted period of protection, and neither Rule nor her dog has experienced any adverse effects. In this respect, the present case is more similar to *Feinstein v. Firestone Tire & Rubber Co.,* 535 F.Supp. 595 (S.D.N.Y.1982), where the plaintiffs asserted a breach of implied warranty claim on behalf of a class with respect to allegedly defective tires. After concluding that a considerable majority of the tires owned by the putative class had functioned as warranted "without incident, during their predicted lives of service," *id.* at 602, the court rejected the plaintiffs' claim that a "defect *which never manifests itself 'ipso facto* caused economic loss' and breach of implied warranty." *Id.* at 603 (emphasis in original). The court in *Feinstein* explained that it was "quite basic" that "[t]ires which lived full, productive lives were, by demonstration and definition, 'fit for the ordinary purposes' for which they were used; hence they were 'merchantable' under U.C.C. § 2–314, and no cause of action for breach of an implied warranty can arise." *Id.* at 602.

Other cases have engaged in a similar analysis, concluding that where a product has fulfilled its useful life without any manifestation of defect, a plaintiff has received the benefit of his or her bargain and has not suffered any "injury." *See, e.g., In re Canon Cameras Litig.,* 237 F.R.D. 357,

360 (S.D.N.Y.2006) ("A plaintiff who purchases a digital camera that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase."); *see also Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315, 320 (5th Cir. 2002) (finding no "injury in fact" for purposes of standing where the plaintiff ingested an allegedly defective pain killer and received effective pain relief without any adverse effects; the court held that the plaintiff "received ... the benefit of her bargain").[5] Following the same reasoning, the court in *Microsoft Corp. v. Manning*, 914 S.W.2d 602 (Tex.App.1995), held that a plaintiff alleging a breach of implied warranty for software need *not* show any manifestation of harm because software has an "indefinite" useful life. The court explained:

> Tires and cars have a distinctly limited usable life. At the end of the product's life, the product and whatever defect it may have had pass away. If a defect does not manifest itself in that time span, the buyer has gotten what he bargained for. Software's useful life, however, is indefinite. Even though the defect is not manifest today ... [t]he only way for an MS–DOS 6.0 buyer to avoid the possibility of injury is to pay for the upgrade, never use the data compression feature, or use another operating system. The buyer never gets what he bargained for, i.e., an operating system with an effective data compression feature.

*Id.* at 609. *See also Hicks v. Kaufman & Broad Home Corp.*, 89 Cal.App.4th 908, 923, 107 Cal.Rptr.2d 761 (2001) ("Foundations, however, are not like cars or tires ... [which] have a limited useful life. At the end of their lives they, and whatever defect they may have contained, wind up on a scrap heap."). In each of these cases, the court recognized that where a plaintiff relies on the "benefit of the bargain" theory to claim economic damages for a breach of implied warranty, there can be no legally cognizable injury if the product in question has already performed as warranted for the duration of its useful life.

In this case, Rule has already received the full benefit of the bargain she anticipated when she purchased ProHeart® 6. If Rule had learned earlier of the unreasonable risks associated with ProHeart® 6 and had refrained from using the product on that basis, she could arguably claim that she suffered an injury of diminished value and seek damages under Mass. Gen. Laws ch. 106, § 2–714(2). Under the facts as pled, however, I find that Rule has not, as a result of her purchase, suffered any cognizable "injury," whether economic or otherwise. I will consequently dismiss her products liability claim based on breach of the implied warranty of merchantability.[6]

## C. Breach of Implied Warranty of Fitness—Count II

▇ In Count II, Rule alleges a third products liability claim: that Defendants

---

**5.** *Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315 (5th Cir.2002) is discussed in greater detail at the conclusion of section II.E, *infra*.

**6.** I note that this analysis of the "injury" requirement of Rule's implied warranty claim is consistent with the reasoning in *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879 (2008), the Massachusetts Supreme Judicial Court's most recent case addressing the "injury" requirement under

Mass. Gen. Laws ch. 93A. In *Iannacchino*, the Supreme Judicial Court observed that where "[a]n implied warranty claim and a c. 93A claim are based on the same economic theory of injury and the same set of alleged facts, they should survive or fail under the same analysis." *Id.* at 634–35, 888 N.E.2d 879. I discuss *Iannacchino* and related Chapter 93A cases in more depth in section II.E, *infra*.

caused her economic harm by breaching the implied warranty of fitness. Rule contends that Defendants had reason to know of the particular purpose for which she required ProHeart® 6, and that she relied upon Defendants' skill and judgment in purchasing the product. (Complaint ¶¶ 32–33.) I find this count must be dismissed for the same reason that Count III must be dismissed; Rule fails to claim any legally cognizable injury caused by Defendants' alleged failure to provide a safe heartworm preventative.

 I also find this count must be dismissed because Rule has not adequately alleged a unique, particular purpose for the use of ProHeart® 6. Under Massachusetts law, "[a]n implied warranty of fitness for a particular purpose exists '[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods.'" *American Shooting Sports Council, Inc. v. Att'y Gen.*, 429 Mass. 871, 878 n. 10, 711 N.E.2d 899 (1999) (*quoting* Mass. Gen. Laws ch. 106, § 2–315). "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." *Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 821, 434 N.E.2d 611 (1982) (*quoting* U.C.C. § 2–315 cmt. 2). Consequently, Defendants can only be liable for a breach of the implied warranty of fitness if Rule envisaged a specific use for ProHeart® 6 peculiar to herself and her dog, and if she communicated that specific purpose to Defendants. According to Rule, the "particu-

lar purpose" for which she purchased ProHeart® 6 was "to provide safe heartworm protection *for six months,* as opposed to other heartworm preventatives that are administered to dogs on a monthly basis." (Doc. 9 at 5) (emphasis in original). This was, however, the ordinary purpose for which ProHeart® 6 was sold and used. (Complaint ¶ 7.) There is nothing in the Complaint to suggest that Rule had a specific purpose for the product peculiar to her circumstances, or that she communicated any such special purpose to Defendants.

### D. Breach of Contract—Count IV

In Count IV, Rule alleges that Defendants promised—through the ProHeart® 6 Complete Control Guarantee—that they would pay for veterinary expenses associated with treating any dog that was diagnosed with heartworm after beginning the ProHeart® 6 regimen. Rule claims that Defendants breached the Guarantee by taking ProHeart® 6 off the market without offering to pay the class's veterinary costs for heartworm treatment, if necessary, in the future. In connection with this count, Rule seeks damages for the veterinary costs that any class member who meets the requirements of the ProHeart® 6 Guarantee has paid or will have to pay in the future to prevent their dog from developing heartworm. (Complaint ¶ 44.)

 Under the plain language of the Guarantee, Defendants promise the owners of "any dog properly treated with ProHeart® 6 *that develops heartworm disease*" (emphasis added) to "reimburse 100% of all diagnostic and treatment-related expenses" and "provide to the client through his or her veterinarian another injection of ProHeart® 6 at no cost." Rule acknowledges that Luke has not developed heartworm. Consequently, Rule is not eligible for veterinarian expenses

under the Guarantee, and there has been no breach of contract by Defendants. For this reason, Rule would not be an adequate class representative for any purchaser, assuming there is one, for whom Defendants have failed to honor the Guarantee. Because Rule has not stated a claim for recovery under the Guarantee, I will dismiss this count.[7]

### E. Violation of Mass. Gen. Laws ch. 93A—Count V

In Count V, Rule alleges that Defendants' acts and practices with respect to ProHeart® 6 constituted unfair methods of competition and unfair or deceptive business practices in violation of Mass. Gen. Laws ch. 93A. Rule contends that under Chapter 93A, § 9, she and the putative class are entitled to damages as measured by the greater of: (i) the difference between the actual value of Pro-Heart® 6 and its value if it had been as warranted (i.e., non-defective), or (ii) statutory damages in the amount of $25 per injection. (Complaint ¶ 50.) As with Rule's claim for breach of the implied warranty of merchantability—*see* section II.B, *supra*—the critical inquiry for her Chapter 93A claim is whether she has alleged a legally cognizable injury. Massachusetts case law construing the Chapter 93A, § 9(1) injury requirement has had a less than intellectually coherent course of development. I have kept this motion under advisement for an extended period of time in the hope that the Supreme Judicial Court would in the interim resolve more completely the tensions in the case law.

To date, the cases with which the Supreme Judicial Court has been presented have not permitted it to do so. Nevertheless, I find that the two most recent opinions from the Supreme Judicial Court—*Hershenow v. Enterprise Rent–A–Car Co.*, 445 Mass. 790, 840 N.E.2d 526 (2006) and *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879 (2008)—offer sufficient guidance to apply the injury requirement in this case. Because much depends upon the development of the injury requirement, I will begin my analysis with an extended historical review of the applicable case law on this issue.

In *Baldassari v. Public Fin. Trust*, 369 Mass. 33, 337 N.E.2d 701 (1975), the Supreme Judicial Court confronted the Chapter 93A, § 9(1) injury requirement as it was stated in an earlier version of the statute. At that time, Chapter 93A, § 9(1) provided a right of action to "[a]ny person who ... suffers *any loss of money or property*, real or personal, as a result of the use or employment by another person of an unfair or deceptive act or practice declared unlawful by [Chapter 93A]." *Id.* at 44 n. 5, 337 N.E.2d 701 (*quoting* Mass. Gen. Laws ch. 93A, § 9(1) (1971)) (emphasis added). The court held, based on the language of the statute, that it was required to dismiss a complaint that alleged only "severe emotional distress," but not any "loss of money or property." *Id.* at 45–46, 337 N.E.2d 701. Four years later, largely in response to the *Baldassari* decision, the Massachusetts legislature amended § 9(1) to provide a right of action to

---

7. To the extent Rule claims in her Opposition to seek a declaratory judgment defining her potential entitlement to future benefits under the Guarantee if Luke ever *does* develop heartworm, I find this case does not present appropriate circumstances for declaratory relief. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (holding that declaratory judgment actions are permissible only where they "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.") (internal quotation omitted).

"[a]ny person ... who has been *injured* by another person's use or employment of any method, act or practice declared to be unlawful by [Chapter 93A]." Mass. Gen. Laws ch. 93A, § 9(1) (1979) (emphasis added). This broadened language remains intact in the current version of the statute.

In *Leardi v. Brown*, 394 Mass. 151, 474 N.E.2d 1094 (1985), the Supreme Judicial Court examined the scope of the amended "injury" requirement of Chapter 93A, § 9(1). The plaintiffs in *Leardi* were residential tenants who initiated a class action against their landlord for including certain provisions in their leases that violated the state Sanitary Code. The landlord had never attempted to enforce the unlawful provisions, and the plaintiffs conceded that none of the class members had ever read the offending clauses. *Id.* at 158, 474 N.E.2d 1094. The Supreme Judicial Court acknowledged that the question was "a close one," but nonetheless held "that the tenant class has been 'injured' within the meaning of G.L. c. 93A." *Id.* at 159, 474 N.E.2d 1094. The court concluded that the term "injury" was broad enough to include "the invasion of any legally protected interest of another," *id.* (*quoting* Restatement (Second) of Torts § 7 (1965)), and explained that "in amending G.L. c. 93A, § 9, the Legislature exercised its prerogative to create a legal right, the invasion of which, without more, constitutes an injury." *Id.* at 160, 474 N.E.2d 1094. The court further noted that where there was no harm for which actual damages could be determined and awarded, the statute provided for the recovery of minimum damages in the amount of $25. *Id.*

The *Leardi* court did, however, attempt to temper the potential sweep of its decision by emphasizing the significance of the parties' landlord-tenant relationship. The court explained:

In so interpreting the injury requirement of G.L. c. 93A, § 9, we do not mean to authorize purely vicarious suits by self-constituted private attorneys-general. One could hardly characterize the relationship of these plaintiffs to the illegal lease at issue here as vicarious. We need not, and do not, decide whether we would reach a similar result under G.L. c. 93A, § 9, in other circumstances. Here the plaintiffs are tenants of the defendants, and the illegality of the defendants' lease is the subject of the instant c. 93A action.

*Id.* at 161, 474 N.E.2d 1094 (internal citations and quotations omitted). Almost a decade later, in *Lord v. Commercial Union Ins. Co.*, 60 Mass.App.Ct. 309, 801 N.E.2d 303 (2004), the Massachusetts Appeals Court seized on this passage from *Leardi* to conclude that *Leardi* "was intended to be limited to the peculiar facts presented." *Id.* at 323, 801 N.E.2d 303. The *Lord* court held that as a general matter, the Massachusetts legislature did not intend Chapter 93A, § 9(1) "to confer on plaintiffs who have suffered no harm the right to receive a nominal damage award.... The plaintiff has the burden of establishing that the defendant's behavior caused him an 'injury.' This is a precondition for recovery; in its absence, the defendant is entitled to judgment." *Id.* at 321–22, 801 N.E.2d 303.

Shortly following *Lord,* the Supreme Judicial Court again addressed the Chapter 93A injury requirement in *Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 813 N.E.2d 476, an appeal from a decision rejecting a class certification. The plaintiffs in *Aspinall* sought to certify a class of purchasers of Marlboro Lights, alleging that the defendant cigarette companies had deceptively advertised that brand of cigarettes. In particular, the plaintiffs alleged that the defendants marketed Marlboro Lights as "light" cigarettes that deliv-

ered "lowered tar and nicotine," when in fact defendants had "intentionally designed the product so that most smokers of Marlboro Lights would receive as much, or more, tar and nicotine than if they had smoked regular cigarettes."[8] *Id.* at 382, 813 N.E.2d 476. The plaintiffs sought damages measured by "the difference between the price paid by the consumers and the true market value of the 'misrepresent[ed]' cigarettes they actually received." *Id.* at 399, 813 N.E.2d 476.

Granting certification of the class by a 4–3 majority, the *Aspinall* court held that all members of the putative class had been "similarly injured" for purposes of Chapter 93A, § 9, despite the plaintiffs' concession that some smokers of Marlboro Lights had in fact received the promised lowered levels of tar and nicotine. *Id.* at 393, 813 N.E.2d 476. Writing for the majority, Justice Greaney concluded that "the deceptive advertising, as alleged by the plaintiffs in this case, if proved, effected a *per se injury* on the consumers who purchased the cigarettes represented to be lower in tar and nicotine." *Id.* at 402, 813 N.E.2d 476 (emphasis added). The court held that "regardless of whether some smokers actually received lower tar and nicotine," all members of the putative class would be entitled at least to statutory damages "because all purchased (and, presumably, smoked) a product that was deceptively advertised." *Id.* In so ruling, the

*Aspinall* court specifically rejected language in the Appeals Court's *Lord* decision "ostensibly limiting the reach of our holding in *Leardi v. Brown* to landlord-tenant actions." *Id.* at 401, 813 N.E.2d 476 (citation omitted). Justice Greaney reiterated that the *Leardi* court had broadly "construed the term 'injury,' in the context of G.L. c. 93A, to denote 'an invasion of a legally protected interest.'" *Id.* (quoting *Leardi*, 394 Mass. at 160, 474 N.E.2d 1094).

The *Aspinall* majority opinion is not, however, altogether clear about the precise nature of the "injury" the court determined the plaintiffs to have alleged. The passage quoted above—describing the defendants' alleged deceptive advertising as a "per se injury"—seems to indicate that merely purchasing a product that was deceptively advertised is itself sufficient to satisfy the Chapter 93A injury requirement. This interpretation is supported by the majority's comment that "[t]he plaintiffs need not prove individual physical harm in order to recover *for the defendants' deception.*" *Id.* at 397, 813 N.E.2d 476 (emphasis added). The apparent breadth of these statements is somewhat confused, however, by the court's failure to distinguish carefully between the concepts of "deception" and "injury."[9] *See, e.g., id.* at 394–97, 813 N.E.2d 476. Furthermore, the court elsewhere hedged its language as

8. Unlike regular cigarettes, Marlboro Lights had "vent holes" on the filter to reduce the level of tar and nicotine that passed through the cigarette. *See Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 383 n. 4, 813 N.E.2d 476 (2004). According to the plaintiffs, these vent holes were designed to function effectively "under machine testing conditions," but were positioned so that most smokers would inadvertently block them with their lips or fingers under normal use. *Id.* The plaintiffs alleged that the defendants failed to instruct consumers of the proper smoking method in order to benefit from the

vent holes, and that most smokers consequently did not receive the advertised lowered levels of tar and nicotine. *Id.*

9. A practice is "deceptive" for purposes of Chapter 93A "if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." *Aspinall*, 442 Mass. at 394, 813 N.E.2d 476 (internal quotations omitted). The "injury" requirement is an independently necessary element of a Chapter 93A claim.

to whether *any* deceptive advertising is sufficient to effect an "injury" under Chapter 93A or whether more is sometimes required. For example, Justice Greaney wrote for the majority that "[w]e reject the proposition that the purchase of an intentionally falsely represented product *cannot be,* by itself, an ascertainable injury under our consumer protection statute." *Id.* at 394, 813 N.E.2d 476 (emphasis added).

Justice Cordy, writing on behalf of three justices in dissent, interpreted this passage from the majority "to mean simply that purchase of a deceptively advertised product *may* in certain circumstances be alone sufficient to meet the injury requirement of G.L. c. 93A, not that the mere purchase of a deceptively advertised product *necessarily* constitutes per se injury." *Id.* at 404 n. 3, 813 N.E.2d 476 (Cordy, J., dissenting) (emphasis in original).[10]

Other language in the *Aspinall* majority opinion suggests that the deceptive cigarette advertising in that case effected a "per se injury" only because it caused another form of compensable injury to most class members: an increased exposure to the harmful substances of tar and nicotine. For example, in addressing the "similar injury" requirement, the majority explained:

> No individual inquiries concerning each class member's smoking behavior are required to determine whether the defendants' conduct caused compensable injury to all the members of the class— consumers of Marlboro Lights *were injured when they purchased a product that, when used as directed, exposed them to substantial and inherent health risks* that were not (as a reasonable consumer likely could have been misled into believing) minimized by their choice of the defendants' "light" cigarettes.

*Id.* at 397, 813 N.E.2d 476 (emphasis added). The *Aspinall* majority observed that the promised benefits of low tar and nicotine levels "are alleged to be untrue for the overwhelming majority of smokers," and emphasized that "the members of the class who have not suffered *the 'injury' of higher tar and nicotine* are both very few in number and impossible to identify." *Id.* at 398 n. 21, 813 N.E.2d 476 (emphasis added). In his dissent, Justice Cordy cited this passage to conclude that the relevant "injury" identified by the majority was, in fact, the exposure of most class members to higher levels of tar and nicotine. *See id.* at 404, 813 N.E.2d 476 (Cordy, J., dissenting).[11]

In 2006, the Supreme Judicial Court revisited the Chapter 93A injury requirement in *Hershenow v. Enterprise Rent–A–Car Co.,* 445 Mass. 790, 840 N.E.2d 526. The two plaintiffs in *Hershenow* contended that the defendant car rental company had included illegal exclusions in the collision damage waiver form that accompanied the plaintiffs' car rentals. Neither of the rent-

---

10. Justice Cordy vigorously objected to the court's holding even under this narrower interpretation of the majority's language, insisting that "[t]he requirement that the plaintiffs demonstrate an 'injury' may not be shrugged off lightly." *Aspinall,* 442 Mass. at 404, 813 N.E.2d 476 (Cordy, J., dissenting). His dissent contended that "[i]t is insufficient for a plaintiff to show merely that a trade practice is deceptive; rather, G.L. c. 93A requires an injury before an award of even nominal damages is justified." *Id.* (internal quotations omitted).

11. Justice Cordy argues on this basis that the class cannot meet the "similar injury" requirement of Chapter 93A, § 9(2), because "some of its members (the low-tar group) suffered no injury at all." *Aspinall,* 442 Mass. at 404, 813 N.E.2d 476 (Cordy, J., dissenting). *But see id.* at 393, 813 N.E.2d 476 ("[B]ecause the injury claimed is an economic, and not a personal, injury, all have been similarly injured.") (Greaney, J., for the majority).

ed automobiles had been involved in any collision or had otherwise been damaged during the rental period. *Id.* at 792–93, 840 N.E.2d 526. The Supreme Judicial Court rejected the plaintiffs' claim that the defendants' allegedly deceptive waiver form had effected a "per se injury" for purposes of Chapter 93A. The court explained that "proving a causal connection between a deceptive act and a loss to the consumer is an essential predicate for recovery under our consumer protection statute." *Id.* at 791, 840 N.E.2d 526. The court further noted that the rental agreements did not make either plaintiff "worse off during the rental period than he or she would have been had the [rental agreement] complied in full with the [state regulations]." *Id.* at 800–01, 840 N.E.2d 526.

The Supreme Judicial Court in *Hershenow* did not expressly overrule *Leardi* or *Aspinall,* but instead sought to distinguish the earlier cases by reading them narrowly. The *Hershenow* majority explained that unlike the illegal car rental waiver forms, the tenant lease provisions in *Leardi* had "acted as a powerful obstacle to a tenant's exercise of his legal rights" because "confronted by unhabitable conditions, the illegal lease terms would deter tenants from exercising their legal rights on pain of loss of their tenancy." *Id.* at 800, 840 N.E.2d 526.[12] The *Hershenow* court also adopted a narrow interpretation of what constituted the pertinent "injury" in *Aspinall.* The court explained that the deceptive cigarette advertising in that case had caused a loss to the plaintiffs because "the members of the plaintiff class purchased 'light' cigarettes that, in most in-

stances, delivered as much or more tar and nicotine as regular cigarettes." *Id.* at 801, 840 N.E.2d 526.[13] Furthermore, the *Hershenow* court expressly rejected the proposition, suggested by some language in *Aspinall,* that a misrepresentation can qualify as an "injury" to consumers who are influenced by it simply because it is "deceptive." *See id.* at 798–99, 840 N.E.2d 526 ("[A] plaintiff seeking a remedy under G.L. c. 93A, § 9, must demonstrate that even a per se deception caused a loss."). In so doing, the court emphasized that "deception" and "injury" are independently required elements of a Chapter 93A claim, and that the invasion of a legal interest is not by itself sufficient to establish an "injury." *See id.* at 802, 840 N.E.2d 526 ("If any person invades a consumer's legally protected interests, and if that invasion causes the consumer a loss—whether that loss be economic or noneconomic—the consumer is entitled to redress under our consumer protection statute. A consumer is not, however, entitled to redress under G.L. c. 93A, where no loss has occurred.").

Three justices did not join the majority opinion in *Hershenow* and in separate opinions rejected the court's attempts to distinguish the case from *Leardi* and *Aspinall.* Justice Cowin, concurring in the judgment, noted that "[t]he court's effort to distinguish the cases seems to me to arise not so much from analytical conviction but from a desire to avoid acknowledging that *Leardi* was wrongly decided." *Id.* at 804, 840 N.E.2d 526 (Cowin, J., concurring). She instead urged the court to overrule *Leardi* expressly and to avoid

12. The *Hershenow* court did not address how the lease terms could act as a deterrent to exercising legal rights where the plaintiffs in *Leardi* had conceded that no members of the tenant class had ever actually read the unlawful provisions and the provisions had never been invoked.

13. This appears to be the same interpretation of the *Aspinall* majority's "injury" analysis that Justice Cordy adopted in his *Aspinall* dissent. *See* Note 11, *supra,* and accompanying text.

unnecessarily confusing Chapter 93A case law. *Id.* at 805, 840 N.E.2d 526. Justice Greaney, the author of the *Aspinall* opinion, dissented on behalf of himself and Justice Spina. He argued that the deceptive inclusion of illegal exclusions in the car leases in *Hershenow* satisfied Chapter 93A's injury requirement because in both *Leardi* and *Aspinall* the Supreme Judicial Court had "broadly declared that it is enough that a consumer has been *wronged* in a discernible way." *Id.* at 808, 840 N.E.2d 526 (Greaney, J., dissenting) (emphasis added). Justice Greaney agreed with Justice Cowin, however, "that there is no meaningful way that [*Hershenow*] can be distinguished from *Leardi*" because "the substance of the injury in this case and in *Leardi* are, for all legal purposes, the same." *Id.* at 809, 840 N.E.2d 526.

Last year, the Supreme Judicial Court issued its most recent opinion addressing the Chapter 93A injury requirement, *Iannacchino v. Ford Motor Co.* The plaintiffs in *Iannacchino* alleged that because of a manufacturing defect caused by the defendants, the doors of vehicles they had purchased "might open accidentally in certain types of collisions, putting vehicle occupants at risk of significant personal injury or death." 451 Mass. at 626, 888 N.E.2d 879. Although the plaintiffs did not claim that the vehicle doors had ever in fact malfunctioned, the court held that the plaintiffs had alleged a cognizable "injury." *See id.* at 624–25, 888 N.E.2d 879 ("We do not consider the lack of accident-related injury or manifested defect a bar to recovery under G.L. c. 93A, § 9, in this case.").[14]

In reaching this conclusion, the *Iannacchino* court drew a sharp contrast with *Hershenow*, based on what the court described as "the difference between the plaintiffs' positions in the two cases." *Id.* at 630, 888 N.E.2d 879. The court explained:

> The plaintiffs here purchased and own vehicles that they allege are noncompliant with applicable safety regulations. In contrast, the *Hershenow* plaintiffs purchased agreements committing a car rental company, Enterprise, to waive claims against them for damage to their rental cars occurring only during the rental period.... [T]he unlawful contract terms did not and could not cause any harm to the plaintiffs *after* they had returned their vehicles undamaged at the end of their rental periods.

> Here, as mentioned, the plaintiffs continue to own the allegedly noncompliant vehicles.... [T]he purchase price paid by the plaintiffs for their vehicles would entitle them to receive vehicles that complied with [federal] safety standards or that would be recalled if they did not comply.... [T]he plaintiffs would have

---

**14.** The *Iannacchino* court ultimately dismissed the plaintiffs' complaint without prejudice because it did not adequately plead that the vehicles were "defective." *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 631, 888 N.E.2d 879 (2008). Adopting the pleading rule established by the Supreme Court for federal courts in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Judicial Court held that "[b]ecause the term 'defect' is conclusory and can be subjective ... [w]here, as in this case, there is no allegation that the plaintiffs—or indeed anyone else—have suffered personal injury or property damage, the com-

plaint must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not." *Iannacchino*, 451 Mass. at 632–33, 888 N.E.2d 879. Here, Rule has alleged that ProHeart® 6 caused adverse health effects, including death, to various dogs who were injected with the product. The *Iannacchino* court's statements regarding the pleading requirements for alleging a "defect" therefore have no bearing on this case because the complaint's allegations that the product was defective clearly meet the requirements of *Twombly*.

paid for more (viz., safety regulation-compliant vehicles) than they received. *Id.* at 630–31, 888 N.E.2d 879 (internal citations and quotations omitted). The Supreme Judicial Court observed in *Iannacchino* that where "[a]n implied warranty claim and a c. 93A claim are based on the same economic theory of injury and the same set of alleged facts, they should survive or fail under the same analysis." *Id.* at 634–35, 888 N.E.2d 879. It is therefore not surprising that the *Iannacchino* court's analysis of the lack of a cognizable "injury" in *Hershenow* is similar to the analysis other courts have employed in breach of implied warranty cases, such as *Feinstein v. Firestone Tire & Rubber Co.*, 535 F.Supp. 595, where the tires purchased by the plaintiffs had functioned as warranted throughout the entire course of their predicted lives of service. *Id.* at 602. In *Feinstein*, as in *Hershenow*, the court held that the plaintiffs were no worse off than if the defendants had never engaged in any deceptive practice. *See* section II.B, *supra; see also Hershenow*, 445 Mass. at 800–01, 840 N.E.2d 526.

■ Applying the reasoning from *Hershenow* and *Iannacchino* to the instant case, I conclude that Rule has not alleged a cognizable "injury" for purposes of Chapter 93A, § 9(1). There is no question that Rule has alleged defendants' failure to warn consumers about ProHeart® 6's risks of adverse effects on dogs was "deceptive," and that she and other consumers might not have paid as much (or might not have paid anything) for the product if defendants had disclosed those risks. *Hershenow* emphasized, however, that despite language in *Aspinall* arguably to the contrary, not every deceptive act or invasion of a legally protected interest constitutes an "injury" under Chapter 93A. While con-

sumer protection statutes may be designed to have a broad reach, Chapter 93A was not "mean[t] to authorize purely vicarious suits by self-constituted private attorneys-general." *Leardi*, 394 Mass. at 161, 474 N.E.2d 1094 (internal quotation omitted). It is necessary for a private plaintiff to show that the defendants' deceptive act caused some form of compensable loss. *See Hershenow*, 445 Mass. at 802, 840 N.E.2d 526. In this case, I find that Rule has not demonstrated any such loss, whether economic or otherwise. Like the plaintiffs in *Hershenow*—and unlike the plaintiffs in *Iannacchino*—Rule has already received the full benefit of the bargain she anticipated when she purchased ProHeart® 6: i.e., Luke remained free from heartworm for the promised period of protection, and neither Rule nor her dog suffered any adverse effects from the product.

It is true that the injury in *Aspinall* could not have been based on the plaintiffs' continued possession of a defective product that had not yet fulfilled its expected life of service, as in, for example, *Iannacchino*. A serviceable interpretation of the *Aspinall* majority opinion, which is supported by the *Hershenow* court's description of that case, is that the plaintiffs' "similar injury" was the shared exposure by an overwhelming majority of the class to higher levels of tar and nicotine and the associated "substantial and inherent health risks" than had been warranted by defendants' advertisements. The plaintiffs' asserted theory of economic damages in that case (i.e., the difference between the price the plaintiffs paid for the cigarettes and the true market value of the cigarettes they actually received) may be seen as simply an approximate means to measure the damages for that injury.[15]

---

**15.** I recognize that there is language in *Aspi-*

*nall* arguably supporting other interpretations

Even under this interpretation of *Aspinall*, one could arguably analogize the increased risk of harm to the *Aspinall* plaintiffs from exposure to tar and nicotine with the increased risk of harm to Luke from exposure to ProHeart® 6. The plaintiffs in *Aspinall*, after all, were not required to make any individualized demonstration of actual physical harm. However, even if *Aspinall* were to be read to hold that an increased exposure to any health risks constitutes a cognizable "injury" under Chapter 93A,[16] I find no basis for extending this principle to an increased risk of damage to property. Regardless of Rule's sentimental attachment to Luke, dogs are treated as property under Massachusetts law. *See Baer v. Tyler*, 261 Mass. 138, 140, 158 N.E. 536 (1927). Because I find that Rule has alleged no personal injury,[17] no property damage, and no economic injury—insofar as she received the full benefit of the bargain she anticipated from her purchase of ProHeart® 6—I will consequently dismiss her Chapter 93A claim.

In resolving the Chapter 93A claim in the context of unsettled state jurisprudence, I am intensely aware of my duty as a federal judge applying state law to anticipate as best I can how the Supreme Judicial Court would resolve this case. *See*

*Moores v. Greenberg*, 834 F.2d 1105, 1107 n. 3 (1st Cir.1987) ("Our mission is to 'determine the rule that the [state] Supreme Court would probably follow, not fashion a rule which . . . an independent federal court might consider best.' ") (*quoting Lowe's N. Wilkesboro Hardware, Inc. v. Fid. Mut. Life Ins. Co.*, 319 F.2d 469, 472 (4th Cir.1963)). I believe the resolution I have given is fully consistent with the current development of Chapter 93A in the Massachusetts courts. The parties cannot expect a federal court to embark on bold new holdings in applying state law. *See Kassel v. Gannett Co., Inc.*, 875 F.2d 935, 949 (1st Cir.1989) ("Although it is possible that the state supreme court might be ready to adopt a different view, we cannot lightly indulge such speculation."); *see also Plummer v. Abbott Labs.*, 568 F.Supp. 920, 927 (D.R.I.1983) ("It is not for this court, sitting in diversity jurisdiction, to blaze a new trail where the footprints of the state courts point conspicuously in a contrary direction. In such a situation, a federal court must take state law as it exists: not as it might conceivably be, some day; nor even as it should be. . . . Plaintiffs who seek out a federal forum in a diversity action should anticipate no more."). Thus, no matter how persuasive, on the one hand, Justice Cowin's sugges-

---

of the cognizable "injury." I find, however, that this is the only reasonable interpretation that is consistent with the "injury" analysis in the Supreme Judicial Court's more recent *Hershenow* decision.

**16.** I note that such an interpretation may place Chapter 93A jurisprudence at odds with Massachusetts tort law. Courts applying Massachusetts law have rejected the proposition that exposure to greater risk of disease or illness constitutes an "injury" in the absence of any actual physical manifestation of harm. *See, e.g., Anderson v. W.R. Grace & Co.*, 628 F.Supp. 1219, 1231 n. 6 (D.Mass.1986) ("The weight of authority would deny plaintiffs a cause of action solely for increased risk because no 'injury' has occurred.").

**17.** Even if Rule had argued that her increased concern about her dog's health was a cognizable personal injury, I would have declined to make such a finding. Massachusetts has not extended recovery of damages in tort for emotional distress resulting from an injury to a third party to include persons who suffer the loss of a companion animal. *See Krasnecky v. Meffen*, 56 Mass.App.Ct. 418, 421–23, 777 N.E.2d 1286 (2002); *Recovery of Damages for Emotional Distress Due to Treatment of Pets and Animals*, 91 A.L.R.5th 545 (2001). Furthermore, even if Massachusetts were to adopt such a novel theory, it would be inapplicable in a case such as this one, where no harm ever befell the animal in question.

tion that *Leardi* be interred, or how intriguing, on the other hand, the prospect of developing broad public policy for Massachusetts by reading *Aspinall* to establish a regime of private attorneys general authorized to roam at large without the obligation to demonstrate actual injury, such initiatives are for the state's highest court, not a federal court sitting in diversity, to seize.

Moreover, I must observe that to the degree Chapter 93A case law is read to elide an actual injury requirement from the statute, the federal courts, operating under federal constitutional standing obligations, may be without jurisdiction to entertain Chapter 93A cases in which the private plaintiff suffers no actual harm. In *Rivera v. Wyeth–Ayerst Labs.*, for example, the Fifth Circuit dismissed claims similar to those in this case on grounds that the plaintiffs lacked Article III standing. The plaintiffs in *Rivera* had bought and ingested an anti-inflammatory drug manufactured by the defendant, which was later removed from the market due to reports of liver failure among some users. 283 F.3d at 316–17. Although the plaintiffs did not allege that the drug was ineffective as a pain killer or had caused them any adverse health effects, they brought claims for breach of implied warranty and violation of the Texas consumer protection statute, contending they had suffered an "economic injury" by purchasing a defective product at full price. *Id.* at 319. Analyzing the case under federal standing principles, the Fifth Circuit concluded: "By plaintiffs' own admission, [they] paid for an effective pain killer, and [they] received just that—the benefit of [their] bargain.... Accordingly, they cannot have a legally protected contract interest." *Id.* at 320. The court held under such circumstances the plaintiffs had suffered no injury-in-fact as required under Article III.

For present purposes, however, I find that the somewhat less-than-tidy jurisprudence of the Chapter 93A "injury" requirement under Massachusetts law provides a sufficiently clear basis for concluding that the plaintiff fails to state a claim. There is therefore no occasion here to consider whether a federal court would have jurisdiction over a Chapter 93A claim involving no injury-in-fact.

## III. CONCLUSION

For the reasons set forth more fully above, I GRANT defendants' motion to dismiss all claims.